Pacific Transport Company and Subsidiaries, et al. [1] v. Commissioner. Pacific Transport Co. v. Commissioner
Docket Nos. 2823-65 - 2825-65, 2928-65 - 2935-65.
United States Tax Court
T.C. Memo 1970-41; 1970 Tax Ct. Memo LEXIS 315; 29 T.C.M. (CCH) 133; T.C.M. (RIA) 70041; February 17, 1970. Valentine Brookes, Richard A. Wilson, and A. Thomas Murphy, 1600 International Bldg., San Francisco, Calif., for the petitioners. Eugene H. Ciranni and James E. Merritt, for the respondent. 135 HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined income tax deficiencies for three taxable periods: January 1 - September 9, 1957; September 10 - December 31, 1957; and January 1 - December 31, 1958, as follows: Docket No.
Petitioner
Taxable Period
Deficiency
2825-65
States S.S. (New States)
1/ 1/57- 9/ 9/57
$785,465.44
2824-65
Pacific Atlantic S.S.
1/ 1/57- 9/ 9/57
$9,209.21
2823-65
Pacific Transport
9/10/57-12/31/57
52,253.01
1/ 1/58-12/31/58 63,379.14
Total amount of deficiencies
$910,306.80
*320 Under section 1502, 1954 Code, respondent determined the same income tax deficiencies against the subsidiary corporations in each affiliated group which filed a consolidated income tax return, in order to protect the revenues, as follows: Docket No.
Petitioner
Taxable Period
Deficiency
Subsidiaries of States Steamship Company
(States Line, Inc.)
2928-65
States S.S. (Old States)
1/ 1/57- 9/ 9/57
$785,465.44
2929-65
Portland Stevedoring
1/ 1/57- 9/ 9/57
785,465.44
2931-65
Pacific Transport Lines
1/ 1/57- 9/ 9/57
785,465.44
2932-65
Calif. Eastern Lines
1/ 1/57- 9/ 9/57
785,465.44
Subsidiaries of Pacific Transport Co.
2930-65
Pacific Atlantic S.S.
9/10/57-12/31/57
52,253.01
1/ 1/58-12/31/58
63,379.14
2933-65
States S.S. (New States)
9/10/57-12/31/57
52,253.01
1/ 1/58-12/31/58
63,379.14
2934-65
Calif. Eastern Lines
9/10/57-12/31/57
52,253.01
1/ 1/58-12/31-58
63,379.14
2935-65
Portland Stevedoring
9/10/57-12/31/57
52,253.01
1/ 1/58-12/31/58
63,379.14
The parties have disposed of several issues under stipulations to which effect will be given under Rule 50. The issues for decision fall into two *321 groups. One group of issues relates to and involves a claimed net operating loss for 1959 for the corporations which filed a consolidated return for 1959. The other group of issues involves adjustments to the basis of shares of stocks and other assets of some of the petitioner corporations. Petitioners claim that there was a net operating loss in 1959 and that they are entitled to carrybacks to the taxable periods in 1957 and to the year 1958. Related to the problems involving 1959, a year which is not before us, is a question about the bar of the statute of limitations against determinations by the respondent for 1959 which would affect the existence or nonexistence of a net operating loss for 1959 and the resulting carrybacks of such loss, if any, to earlier years. The main issues for decision are as follows: 1. Whether the petitioners had a net operating loss for 1959 which can be carried back to 1957 and 1958. The determination of that broad issue involves the following questions: A. Whether a statute of limitations prevented the respondent from making determinations with respect to an alleged net operating loss for 1959 (a closed year), in order to determine the respective *322 amounts of carrybacks, from 1959 to each one of the taxable periods, of a 1959 net operating loss, if any. B. Whether the total sum of the payments by New States in 1959, in the net amount of $1,348,868.39, now in issue, which was paid to settle cargo loss claims under a court judgment which became final in 1959, was a deductible loss of New States in 1959, or was a capital expenditure. If this question is decided for the respondent, there are additional questions relating to allocations of such capitalized expenditure to certain assets. C. Whether there should be excluded from the income of New States for 1959, the full amount of its deposit of $1,175,000 into the capital reserve account maintained by the Maritime Administration (Marad), pursuant to section 607 of the Merchant Marine Act of 1936, as amended; or whether respondent's theory is correct that under certain circumstances the amount of such 136 exclusion should be adjusted to a lesser amount, or to zero so that no exclusion can be allowed. 2. Whether certain adjustments of respondent to the basis of certain assets, under section 334(b)(2), were correct, as follows: A. The value on June 30, 1957, of the California *323 Eastern Lines stock. B. The value on June 30, 1957, of Pacific Transport Lines stock. C. Whether New States is entitled to include in its basis of the shares of stock of Old States (which New States purchased) the amount of the earnings and profits of three, third-tier subsidiaries of Old States, during the interim period between the acquisition of Old States' stock on July 11, 1956, and the "liquidation and merger" of Old States into New States on June 30, 1957. Immediately prior to the "liquidation and merger" of Old States into New States on June 30, 1957, Old States held a substantial part or all of the shares of stock of the three subsidiary corporations, Pacific Transport Lines, Portland Stevedoring Co., and California Eastern Lines, and when Old States was liquidated, the shares of stock of these subsidiaries were among the assets received by New States. Thus, the three subsidiaries of Old States became subsidiaries of New States on June 30, 1957. The three subsidiaries of Old States, and of New States as of June 30, 1957, had not been liquidated as of June 30, 1957. Respondent agrees that the earnings and profits of Old States during the interim period, July 11, 1956, to *324 June 30, 1957, in the amount of $744,943.86 are to be included in the basis to New States of the shares of stock of Old States which were purchased on July 11, 1956, under section 334(b)(2), 1954 Code. Petitioners contend that the earnings of the above-named subsidiaries during the interim period in the total sum of $1,930,431.89 also should be included in the basis to New States of the shares of stock of Old States. Findings of Fact Some facts have been stipulated. The stipulated facts are so found. The stipulations are incorporated herein by reference. All of the income tax returns for the taxable periods involved were filed with the district director of internal revenue at San Francisco, California. The principal office of the petitioners is located in San Francisco. All of the income tax returns for the taxable periods involved here (and the related returns for 1959 and for the period July 11 to December 31, 1956) were made under an accrual method of accounting. Preliminary Facts The principal taxpayers and the taxable periods involved are: Docket No. 2823-65
Pacific Transport Co
Sept. 10 to Dec. 31, 1957
Jan. 1 to Dec. 31, 1958
Docket No. 2824-65
Pacific Atlantic S.S. Co
Jan. 1 to Sept. 9, 1957
Docket No. 2825-65
States S.S. Co. (New States)
Jan. 1 to Sept.9, 1957
*325 The chief issues involve States S.S. Co. (New States). 1959 Net Operating Loss: The taxable year 1959 is not before us. Respondent did not determine a tax deficiency for 1959. Pacific Transport Company and its subsidiaries filed a consolidated return for 1959 in which was reported a net operating loss in the amount of $1,455,802.07. That net operating loss was carried back by some of the petitioners to a taxable period in 1957, or to 1958, or to both periods. Respondent reduced the claimed net operating loss for 1959 from $1,455,802.07 to $24,534.29, and he either reduced a claimed net operating loss carryback deduction, or he disallowed all of a claimed net operating loss carryback, in these cases. Respondent determined that certain deductions claimed on the 1959 return are not allowable. Those determinations have resulted in issues for decision here involving transactions of New States in 1959, for the purpose of claimed deductions, for a taxable period in these cases, for net operating loss carrybacks from 1959. The facts about the 1959 transactions of New States are set forth hereinafter. The Corporation Petitioners: Because of the respondent's determinations, 11 petitions *326 have been filed in these consolidated cases. However, only seven corporations filed the 11 petitions: States Steamship Co. (New States, formerly States Line, Inc.), States Steamship Co. (Old States), Portland Stevedoring Co., Pacific Transport Lines, California Eastern Lines, Pacific Atlantic Steamship Co., and Pacific Transport Co. For the period January 1 to September 9, 1957, a consolidated return, on an accrual 137 basis, was filed by States Steamship Co. (New States), the parent, for itself and its four subsidiaries, as shown below; and a separate tax return was filed by Pacific Atlantic Steamship Co. (Pacat). The affiliated group which filed the consolidated return consisted of: States Steamship Co. (New States) (formerly States Line), parent corporation Subsidiaries: States Steamship Co. (Old States) Portland Stevedoring Co.
Pacific Transport Lines California Eastern Lines For the periods September 10 to December 31, 1957, and January 1 to December 31, 1958, consolidated returns, on an accrual basis, were filed for another affiliated group, in which States Steamship Co. (New States) was a subsidiary, and there was a new parent corporation, Pacific Transport *327 Company, as follows: Pacific Transport Co., parent corporation Subsidiaries: States Steamship Co. (New States) Portland Stevedoring Co.
California Eastern Lines Pacific Atlantic S.S. Co. (Pacat) After the consolidated returns were filed for the respective affiliated groups listed above, but before the petitions were filed here giving rise to these cases, three corporations were dissolved, and four of the corporations were not dissolved. The four petitioner corporations which still exist, and were not dissolved, are: 1. States Steamship Company (formerly States Line, Inc.), a Nevada corporation, which is hereinafter called New States. 2. Pacific Transport Company, a Nevada corporation. 3. Portland Stevedoring Company, an Oregon corporation. 4. Pacific Atlantic Steamship Company, a Delaware corporation, which is sometimes called "Pacat" hereinafter. The three corporations which were dissolved are: (1) States Steamship Company, a Nevada corporation, which is sometimes called "Old States" hereinafter; (2) Pacific Transport Lines; and (3) California Eastern Lines. In 1959, the affiliated group consisted of Pacific Transport Company and three subsidiaries, (1) *328 States Steamship Company (New States), Portland Stevedoring Company, and Pacific Atlantic Steamship Company (Pacat). These affiliated corporations filed a consolidated return for 1959 on an accrual basis. As stated above, these four corporations are still in existence. States Line, Inc., was incorporated in Nevada on June 28, 1956, by J.R. Dant. On July 11, 1956, under circumstances stated later, States Line, Inc., acquired all of the stock of States Steamship Company, a Nevada corporation, which owned all of the capital stock of Portland Stevedoring Company and Pacific Transport Lines, and 43.66 percent of the stock of California Eastern Lines. From July 11, 1956, until June 30, 1957, States Steamship Company was a subsidiary of States Line, Inc., and during that period there was only one corporation named "States Steamship Company". On June 30, 1957, under circumstances stated later, States Steamship Company was "liquidated and merged" into States Line, Inc., under a Nevada statute, and thereupon the name of States Line, Inc., was changed to "States Steamship Company", the name of its former subsidiary. This resulting corporate entity, States Steamship Company (formerly States *329 Line, Inc.) is referred to hereinafter as New States; and its former subsidiary (which was "liquidated and merged" on June 30, 1957) is referred to hereinafter as Old States. The corporation New States (States Steamship Company) is still in existence. Pacific Transport Company, a Nevada corporation, was organized on September 10, 1957. For the period July 11 to December 31, 1956, States Line, Inc., which was incorporated on June 28, 1956, (which later adopted the name, on June 30, 1957, States Steamship Company, herein called New States) was a parent corporation of an affiliated group, and its subsidiaries were States Steamship Company (Old States), Portland Stevedoring Company, Pacific Transport Lines, and Quaker Line, Inc. States Line, Inc., and its subsidiaries filed a consolidated return for the period July 11 to December 31, 1956, which return was made on an accrual method of accounting. Other Corporations and Individuals: C.E. Dant, who died in 1945, was a senior member of the Dant family of Oregon, and J.R. Dant is one of his sons. Dant & Russell, Inc., a Delaware corporation, was primarily a family holding company of the Dant family. The principal asset of Dant & Russell, *330 Inc., was a controlling interest in the stock of Coos Bay Lumber Company 138 which owned extensive timberlands and leases on such lands, saw mills and finishing mills, lumber yards, and other accessories of a lumber business. Dant & Russell, Inc., also had investments in other forest products companies, and it owned shipping interests. J.R. Dant was the principal manager of the shipping interests. J.R. Dant was the vice president and general manager of States Steamship Company (Old States) from 1950 to 1956. Before July 10, 1956, Dant & Russell, Inc., owned all of the capital stock of States Steamship Company (Old States), and of Pacific Atlantic Steamship Company (Pacat). At that same time, States Steamship Company (Old States) owned all of the stock of Quaker Line, Inc., 43.66 percent of the stock of California Eastern Lines, Inc., and all of the stock of Pacific Transport Lines, Inc., and of Portland Stevedoring Company. The Transactions with Blyth & Co., Inc.: Early in 1956, Blyth & Co. began negotiations for the acquisition of all of the stock of Dant & Russell, Inc. These negotiations culminated in an "Option, Purchase and Escrow Agreement" dated March 1, 1956. The *331 option agreement was agreed to and signed by all of the stockholders of Dant & Russell other than J.R. Dant, who owned 19 percent of the stock of Dant & Russell. J.R. Dant is the president of States Steamship Company (New States) and Pacific Transport Company. He has held that office ever since each corporation was organized; i.e., since June 28, 1956, when States Line, Inc. was organized, the name of which was changed to States Steamship Company (New States), and since September 10, 1957, when Pacific Transport Company was organized. After the agreement of March 1, 1956, the Option, Purchase and Escrow Agreement relating to stock of Dant & Russell, Inc., had been signed by all of the Dant & Russell shareholders except J.R. Dant, negotiations between Blyth & Co. and J.R. Dant were entered into for the purpose of the acquisition of all of the shares of stock of two steamship companies owned by Dant & Russell, namely States Steamship Company (Old States) and Pacific Atlantic Steamship Co. (Pacat), which acquisition of shares of stock was to be by J.R. Dant, or his assignee. J.R. Dant was to acquire the shares of stock from Blyth & Co. in the event that Blyth should exercise its option *332 to acquire the stock of Dant & Russell. In turn, J.R. Dant would agree to the terms of the option agreement of March 1, 1956, relating to the Dant & Russell shares of stock. Dant's negotiations with Blyth culminated in the execution of a pledge agreement dated June 18, 1956, between J. (Jack) R. Dant, Blyth, and Bank of California. On July 10, 1956, Blyth & Co. acquired all of the stock of Dant & Russell, Inc., and Blyth caused Dant & Russell to be dissolved. In that dissolution, Blyth acquired, inter alia, all of the stock of States Steamship Company and Pacific Atlantic Steamship Co. Blyth caused States Steamship Company to declare and pay it a dividend of $2,500,000 on July 10, 1956. On July 11, 1956, Blyth sold the stock of Pacific Atlantic Steamship Co. to J.R. Dant, personally, for $1,950,000, pursuant to the terms of the pledge agreement of June 18, 1956; and on July 11, 1956, Blyth also sold to States Line, Inc., as the assignee of J.R. Dant, all of the stock of States Steamship Co. for $11,050,000, pursuant to the agreement of June 18, 1956. Both sums were paid in cash to Blyth. States Line, Inc. (referred to above) was a Nevada corporation which was incorporated on June 28, 1956, by *333 J.R. Dant, who acquired all of its issued stock for cash. States Line, Inc., borrowed additional funds from banks and other sources. States Line, Inc., then purchased from Blyth, with its funds (so obtained) all of the stock of States Steamship Company. It was the plan of Dant that States Line, Inc., as the sole shareholder of States Steamship Company, would dissolve States Steamship and would acquire all of its assets within two years, so that such dissolution and acquisition of assets would come within section 334(b)(2), 1954 Code. That plan was carried out. Liquidations and Mergers of Steamship Companies: From July 11, 1956, until June 30, 1957, States Steamship Company (Old States) was a wholly owned subsidiary of States Line, Inc. On June 30, 1957, pursuant to section 78.540, Revised Statutes of Nevada, States Steamship Company was liquidated by and merged into States Line, Inc., which then adopted the name, States Steamship Company, which is usually referred to as New States. As of June 30, 1957, the liquidated corporation known as States Steamship Company (Old States) owned all of 139 the stock of three subsidiary corporations, Pacific Transport Lines, Inc., Portland *334 Stevedoring Company, and Quaker Line, Inc., and 1,202 shares (out of 2,276 shares) of the stock of California Eastern Lines, Inc. As a result of the liquidation and merger on June 30, 1957, of States Steamship Company by States Line, Inc., the latter corporation acquired the above-described shares of stock of the four corporations, and by the end of August 1957, the remaining shares of California Eastern Lines were acquired. Thus, States Line, Inc., which was renamed States Steamship Company (New States), acquired four subsidiaries, Pacific Transport Lines, Portland Stevedoring, Quaker Line, and California Eastern Lines. However, on August 23, 1957, Pacific Transport Lines, Inc., was liquidated and merged into its parent corporation, States Steamship Co. (New States) pursuant to Nevada law, and States Steamship Co. then had three subsidiaries, named above. J.R. Dant, for business reasons, wanted to have all of the stock of Pacific Atlantic S.S. Co. (which he owned personally), and all of the stock of States Steamship Co. (New States) owned by one corporation. Therefore, he caused a new corporation, Pacific Transport Company, to be incorporated under Nevada law on September 10, 1957. Pacific *335 Transport Company then issued its own stock to the shareholders (J.R. Dant and others) of States Steamship Co. (New States) in return for their stock in States Steamship Co. (New States), which exchange was carried out pursuant to section 351, 1954 Code. As of September 10, 1957, J.R. Dant owned only 83.61 percent of the stock of States Steamship Co. (New States), having sold 16.39 percent thereof to other persons. Therefore, in the abovedescribed transaction, J.R. Dant acquired only 83.61 percent of the stock of Pacific Transport Company. Also, on September 10, 1957, Pacific Transport Company acquired all of the stock of Pacific Atlantic S.S. Co. (Pacat) from J.R. Dant for cash and promissory notes. On October 29, 1957, States Steamship Co. (New States) sold all of the capital stock of Portland Stevedoring Company to Pacific Atlantic S.S. Co. (Pacat) for cash. In addition, it is stipulated that States Steamship Co. (New States) dissolved its subsidiary, Quaker Line, during 1957 in a non-taxable transaction. Quaker Line was a dormant corporation prior to its dissolution, and it held no assets and earned no income in 1957. On March 31, 1958, another subsidiary, California Eastern *336 Lines, Inc., was liquidated by and was merged into its parent, States Steamship Co. (New States). As a result of the above transactions, there are still in existence the four corporations, Pacific Transport Company, a parent corporation, and its three subsidiaries, States Steamship Company (New States), Portland Stevedoring Company, and Pacific Atlantic S.S. Co. (Pacat); or four corporations (as already noted hereinbefore). Pacific Atlantic S.S. Co. (Pacat): For the taxable period January 1 to September 9, 1957, Pacific Atlantic S.S. Co. (Pacat), Docket No. 2824-65, filed a separate income tax return. During that taxable period all of its stock was owned by J.R. Dant, who purchased the shares on July 11, 1956, from Blyth & Co. On September 10, 1957, Pacific Transport Company purchased from J.R. Dant all of the shares of stock of Pacat; Pacat became and continued to be a subsidiary of Pacific Transport Company; and the taxable income of Pacat was reported in the consolidated tax returns filed for the affiliated group for all of the taxable periods beginning on September 10, 1957, and thereafter, including 1959. A net operating loss of $1,455,802.07 was reported in the 1959 consolidated *337 return of Pacific Transport and its subsidiaries, including Pacat. A claim on behalf of Pacat was made for a loss carryback from 1959 to the taxable period ended September 9, 1957, for which period Pacat filed a separate tax return. The tax deficiency for Pacat for the period ended September 9, 1957, results from a disallowance of a deduction for a net loss carryback for 1959. The facts relating to questions involved in the issue of whether the affiliated group sustained a net operating loss for 1959 are set forth hereinafter. The determinations of those questions will determine whether respondent's denial of an operating loss carryback from 1959 was or was not correct. Statute of Limitations The period of the statute of limitations was extended for the taxable periods in these cases by the timely executions of consents, Form 872, by the respondent and the respective petitioners extending the period of assessment. The consents were executed for the taxable periods January 1 140 to September 9, 1957; September 10 to December 31, 1957; and January 1 to December 31, 1958. The consents were executed with respect to all of the petitioners. No consent, Form 872, was ever executed *338 to extend the statute of limitations as it applies to the taxable year 1959. Pacific Transport Company and its subsidiaries executed and mailed to the Internal Revenue Service, at its request, a consent form, No. 872, for the year 1959, while the statute of limitations concerning 1959 was still open. Nevertheless, the Internal Revenue Service returned that consent, without signing it, to Pacific Transport, and thereby the period of the statute of limitations closed the year 1959, and the period of that statute was never extended for 1959. None of the consents, Form 872, extending the periods of the statute of limitations and the periods of assessments, described above, relating to the two taxable periods in 1957, and to the year 1958, contain any references at all to the taxable year 1959, or to the matter of any net operating loss carrybacks from 1959 into any one of those three, earlier, taxable periods. The consolidated tax return for 1959 of Pacific Transport Company and its affiliates was filed timely. The respondent did not mail any deficiency notice with respect to the year 1959 to Pacific Transport; he did not determine any tax deficiency for 1959, with respect to that *339 consolidated return, and the year 1959 is closed. On the other hand, in determining the tax deficiencies for the three taxable periods involved here, for 1957 and 1958, the respondent made certain adjustments in deductions with respect to 1959, for Pacific Transport and its subsidiaries, and with respect to New States in particular, whereby he determined that there was not any net operating loss for 1959, for the purposes of the claimed net operating loss carrybacks from 1959 into the taxable periods in these cases; and he disallowed the deductions claimed for the taxable periods here, for the claimed carrybacks of the alleged net operating loss reported for 1959. Those determinations are in dispute in these cases under issues set forth hereinafter. Net Operating Loss, 1959, Pacific Transport Co. and Subsidiaries The 1959 return reported in detail the income, deductions, and gain or loss of the four affiliated corporations as follows: Pacific Transport, loss
($178,086.25)
States, loss
(1,431,267.78)
Pacific Atlantic, loss (23,005.10)
Total loss
($1,632,359.13)
Portland Stevedoring, gain 176,557.06
Net operating loss
($1,455,802.07)
After the 1959 *340 return was filed, three of the affiliated corporations claimed carrybacks of the 1959 net operating loss under section 172(a) and (b), 1954 Code, to earlier years, namely Pacific Transport Co., New States, and Pacific Atlantic. Pacific Transport Co. claimed carrybacks to the September-December 1957 period, and to 1958. New States claimed a carryback to the January-September 1957 period of $1,276,460.94. Pacific Atlantic claimed a carryback to the January-September 1957 period. The loss carryback deductions were, in each instance, tentatively allowed by the Internal Revenue Service and tax refunds were made. As stated before, the parties executed Form 872 agreeing to extend the period of assessment with respect to the two tax periods in 1957 and the year 1958. Thereafter, upon audits of the respective tax returns for each of those three taxable periods, and particularly with respect to the tax periods into which carrybacks of the 1959 net operating loss had been claimed, the Internal Revenue Service examined in detail the various deductions in the 1959 consolidated return which had produced a net operating loss for each one of the three corporations which had reported a loss for 1959, *341 as shown above. Under those examinations, the Internal Revenue Service made determinations having the result that New States had not sustained any net operating loss at all for 1959, thereby eliminating the reported loss of New States, $1,431,267.78, from the net operating loss of the affiliated group. Consequently, the Internal Revenue Service (IRS) determined that the consolidated net operating loss for 1959 was only $24,534.29, as follows: Net operating loss of the group
$1,455,802.07
Less loss of New States 1,431,267.78
Adjusted loss of the group
$24,534.29
The respondent allowed Pacific Transport Co., Docket No. 2823-65, a loss carryback to the September-December 1957 period, of a proportion of the new adjusted 1959 loss, in the amount of $21,727.54, only, whereas that corporation had claimed $158,824.37 as its share of the original 1959 loss carried 141 back to that taxable period. Also, the IRS allowed Pacific Atlantic, Docket No. 2824-65, a loss carryback to the January-September 1957 period, of a proportion of the new adjusted 1959 loss, in the amount of $2,806.75, only, whereas that corporation had claimed $10,668.68 as its share of the original *342 1959 loss, carried back to that taxable period. The sum of the two allowed loss carrybacks is $24,534.29. Pacific Transport Company also claimed a carryback from 1959 to 1958 of $48,964.48, but in Docket No. 2823-65, Pacific Transport Co., the respondent determined in the deficiency notice that it was not entitled to any loss carryback deduction because there was not any remaining net operating loss for 1959 which was available as a carryback to 1958. In Docket No. 2825-65, States Steamship Company, the respondent determined in the deficiency notice with respect to the period January 1 to September 9, 1957, that there was no net operating loss for 1959 available as a carryback to that taxable period and that, therefore, a claimed loss carryback of $1,276,460.94 was disallowed. That loss carryback had been claimed as a carryback to that taxable period of States Steamship Co. and its subsidiaries. Apparently the IRS did not deem it necessary to keep open the taxable year 1959, of the affiliated group involved, by executing a consent to extend the period of assessment for 1959 (to which it did not agree, as stated before), because it had determined that there was a net operating loss *343 for 1959 for the affiliated group of $24,534.29 (even though the reported net operating loss of the group had been greatly reduced). Obviously, since the group had a small net operating loss for 1959, as determined upon audits by the IRS, no statutory deficiency notice for 1959 was or could be issued. The determination that New States did not have any net operating loss for 1959 reflected the following determinations: Unallowable Deductions, $1,431,267.78:
Cargo loss payments
$1,348,868.39
Disallowed depreciation
24,411.10
Maritime deposits
53,025.43
Initiation fees
4,450.00
Filing fees 512.86
$1,431,267.78 The respondent mailed a statutory notice of deficiency, on February 26, 1965, to Pacific Transport Co. and subsidiaries covering the periods September-December 1957, and 1958. In the deficiency notice, the net operating loss for 1959, $1,455,802.07 was reduced by the sum of $1,431,267.78, leaving as the revised net operating loss $24,534.29, for the group. In the deficiency notice, the five deductions set forth above were disallowed by the respondent. This is the statutory deficiency notice from which petitions were filed here in the following cases: *344 Docket No. 2823-65, Pacific Transport Co.; Docket No. 2824-65, Pacific Atlantic S.S. Co.; and Docket No. 2825-65, States S.S. Co. (New States). Respondent's determinations with respect to the claimed net operating loss of New States for 1959, disallowing the deductions of New States, stated above, meant that respondent determined that for 1959 the deductions allowable to New States were equal to its total income of $6,527,894.96; and that New States did not realize either income or an operating loss for 1959. For 1959, New States reported gross profit from its operations of $1,457,543.09; it received net subsidy payments from the Maritime Administration (Marad) of $4,809,080.36, which was reported in income. New States received other income of $261,271.51. Respondent did not make any adjustments in the items of reported income. In more detail, reported income of New States for 1959 was: 1959
Gross receipts
$22,600,409.67
Less operations cost 21,142,866.58
Gross profit
$1,457,543.09
Subsidy receipts, Marad
4,809,080.36
Interest
111,634.13
Net gains
3,509.78
Other income 146,127.60
Total income
$6,527,894.96
New States took deductions totaling *345 $7,959,162.74, and reported a net operating loss of $1,431,267.78. Included as one item in the deductions of New States in the consolidated return was $2,074,028.43, "Deposits of tax deferred earnings in reserve funds [held by Maritime Administration]." In making his determinations of the unallowable deductions, as set forth previously, the disallowed deductions, exclusive of Maritime deposits of $53,025.43, totaled $1,378,242.35. Other deductions on the return for New States totaled $6,580,920.39, exclusive of the disallowed deductions of $1,378,242.35 (cargo loss payments, depreciation, initiation fees, and filing fees). The difference between "other deductions" and total income reported was $53,025.43, as follows: 142 Other deductions
$6,580,920.39
Total income 6,527,894.96
Difference
$53,025.43
Respondent adopted the viewpoint that a deduction was allowable for those deposits provided that such deduction would not produce a net operating loss of New States for 1959. In order to arrive at a total figure for allowable deductions which would be equal to the figure for total income for 1959, $6,527,894.96, the respondent subtracted that amount of total *346 income from all of the deductions which were "allowable", $6,580,920.39. The difference in the two figures was $53,025.43. Therefore, he disallowed $53,025.43 of the deduction of $2,074,028.43 for deposits paid to the Maritime Administration (Marad) thereby allowing a deduction for those payments of $2,021,003, which determination made the figure for allowable deductions $6,527,894.96, the same as the figure for total income. In other words, respondent's determination that the amount of the Marad deposits which was not an allowable deduction was an amount which was an "adjusting" amount, arithmetically. Respondent gave the following reason in the deficiency notice for this particular determination: It is determined that voluntary deposits to reserve funds under Section 607 of the Merchant Marine Act of 1936 as amended cannot exceed taxable income. Accordingly, the taxable income of States Steamship Company and the affiliated group filing the consolidated return for 1959 is increased $53,025.43, or such other amount as exceeds taxable income without this adjustment, as shown in the attached *347 Exhibit C. The parties have agreed under stipulations about the disposition of several of the determinations of the respondent which contributed to the deficiencies in Docket Nos. 2823-65, 2824-65, and 2825-65, $63,379.14, $52,253.01, and $785,465.44, respectively. Under Rule 50, effect will be given to those stipulations of the parties. There are two main issues in dispute resulting from respondent's determination that the 1959 net operating loss of New States was such less than was reported in the consolidated return so that a smaller net operating loss was available for carrybacks from 1959 to 1958 and 1957: (1) Whether payment by New States in 1959 in the net sum of $1,348,868.39, to settle a court decision awarding damages to cargo-loss claimants, is deductible as a loss, or is to be capitalized and added to New States' cost of assets of Old States received upon the liquidation and merger of Old States on June 30, 1957. (2) Whether the payment by New States to Marad for 1959 of $1,175,000, to the capital reserve account of New States maintained by Marad, is excludable (or deductible) for New States' 1959 income in whole or in part. Cargo Loss Claims; S.S. Pennsylvania
*348 States Steamship Co. (Old States) was a subsidiary of Dant & Russell, Inc., in 1952. In July 1956, States Steamship became a subsidiary of a new corporation, States Line. On June 30, 1957, States Steamship (Old States) was liquidated and merged into States Line, which then adopted the same name, States Steamship Company. Because of this adoption of the same name of a dissolved corporation, States Steamship Company, formerly States Line, is called New States. The facts under this issue involve the original corporation, Old States, and the new corporation, New States. Since dates are of significance under this issue, the following dates are listed, for convenience: 1. January 9, 1952; the S.S. Pennsylvania, owned by Old States, sank at sea in a storm. 2. July 13, 1954; the beginning of a trial in the United States District Court, District of Oregon, of a lawsuit instituted by the owners of cargoes of grain, to be carried to Japan, which they had shipped on the S.S. Pennsylvania, against Old States. 3. November 17, 1955; date of decision of the District Court. 4. February 16, 1956, date of entry of the decision of the District Court. 5. March 22, 1956; date of advice by Erskine *349 Wood, attorney, to J.R. Dant about loss liability of Old States; Wood was attorney for Old States. 6. May 18, 1956; date of the filing of an appeal in the United States Court of Appeals for the Ninth Circuit from the District Court's decision. 7. June 28, 1956; incorporation of States Line, Inc. 8. July 10, 1956; date when Blyth & Co. acquired all of the stock of Dant & Russell, Inc., and all of the stock of Old States. 9. July 11, 1956; date when Blyth sold all of the stock of Old States to States Line, Inc., for $11,050,000. 10. May 31, 1957; date of first opinion of the Court of Appeals affirming the 143 opinion of the District Court in the cargo loss lawsuit. 11. June 28, 1957; date of filing in the Court of Appeals of petitions for rehearing. 12. June 30, 1957; date of dissolution of Old States upon its merger into States Line (New States). 13. July 23, 1957; date of filing in the Court of Appeals of the petition for rehearing by States Steamship Co. (New States), formerly States Line. 14. November 15, 1957; date of modified opinion of the Court of Appeals in the cargo loss litigation, and of remand of the case to the District Court for further proceedings. *350 See 259 F. 2d 463. 15. August 20, 1958; date of further amendment by the Court of Appeals of its opinion in the cargo loss case. See 259 F. 2d 463, 470. 16. January 12, 1959, and February 24, 1959; certiorari denied by United States Supreme Court of petitions to review the final decision of Court of Appeals; 358 U.S. 993; 359 U.S. 921. In 1952, Old States owned and operated the S.S. Pennsylvania, a Victory-type ship; and it operated that ship for carrying freight. This ship was 455 feet long; 62 feet beam; and its gross tonnage was 7,608 tons. On January 5, 1952, the Pennsylvania sailed from Seattle, Washington, carrying cargoes of grain. Its destination was Yokohoma, Japan. Its route was over the great circle route from Seattle. On January 9, 1952, there was a heavy storm in the Gulf of Alaska where the ship had arrived. In the storm, the ship was wrecked and lost 505 miles northwest of Seattle. The ship, crew, and cargo were completely lost. No wreckage ever was found. Lawsuits were instituted against Old States and its insurers for damages from the loss of life and property. Prior to 1956, Old States settled all lawsuits *351 involving claims for the loss of the crew. The shippers of the grain cargo filed a lawsuit against Old States and its insurers for the recovery of the value of the lost cargo. The trial of the lawsuit in the United States District Court for the District of Oregon began on July 13, 1954. The plaintiffs were the United States and Canada, each having shipped a separate shipment of grain. Atlantic Mutual Insurance Co. and Pacific National Fire Insurance Co., insurers, also were plaintiffs because they had insured the grain shipments. The combined cargo loss claims of United States and Canada amounted to $1,199,674.45. (Canada's claim seems to have been $24,392.14.) The claim of Atlantic Mutual Insurance was $434,936.52, and the claim of Pacific National Fire Insurance was $525,400. The total amount of all of the claims was $2,160,010.97. Section 183(a) of Title 46 of the U.S. Code limits the liability of the owner of a vessel. It provides, inter alia, that the liability of the owner of a vessel for any loss of any property, goods, or merchandise shipped or put on board of such vessel shall *352 not exceed the amount of the value of the interest of the owner in the vessel, and her freight then pending (freight charges), if the loss was without the privity or knowledge of the owner. Since the Pennsylvania was never recovered or salvaged, the value of the vessel after the disaster was zero, so that under section 183(a) Old States' liability might be, or could be, limited to the freight charges. During the trial of the lawsuit, it was established that the bills of lading provided that Old States would not be liable for the loss of cargo "by a peril of the sea". Old States had the burden of proving that the loss was caused by a peril of the sea. On November 17, 1955, the District Court rendered its opinion in an unreported memorandum opinion consisting of two typewritten pages. The court's findings included the following facts: That the storm was not of such magnitude as to constitute a peril of the sea; and that latent defects and faults in the Pennsylvania had developed. Although it was not stated in the opinion, it was established during the trial that a 14-foot crack had developed *353 in the hull of the ship during the storm, through which water had flowed into the engineroom, and before aid could arrive, the ship sank. The court found that the vessel had been unseaworthy, but that any defects in the vessel which had caused her to sink were not apparent, and that those charged with her inspection had used reasonable and prudent care. A question to be decided in the litigation was whether, under the facts and circumstances, knowledge that the vessel was not seaworthy could be imputed to Old States. The District Court held that those charged with the inspection of the ship, and the owner, Old States, were without privity or knowledge of any defects in the ship, and that therefore, Old States was entitled to the limitation of liability provided by 144 section 183(a), U.S. Code. This meant that the liability of Old States was limited to $82,256.25, the pending freight charges. The parties have stipulated that the decision of the District Court on November 17, 1955, was to the effect that Old States was liable to the shippers for their loss of cargo, but that the liability *354 was limited under section 183(a), 46 U.S. Code, to an amount which was less than the insurance protecting Old States against liability. On February 16, 1956, the District Court entered its decree, or judgment, under its decision. All of the parties, including Old States, filed appeals from the District Court's decree in the United States Court of Appeals for the Ninth Circuit. Old States appealed from the findings that the Pennsylvania was not lost because of a peril of the sea and that she was unseaworthy. Old States' appeal was filed on May 18, 1956. The United States and Canada, who were the cargo loss claimants, and the insurance companies appealed from the District Court's ruling that there was not privity and knowledge in Old States of the existence of the conditions which had made the Pennsylvania unseaworthy, and from the holding that the liability of Old States was only the limited liability consisting of only the pending freight, or the freight charges paid by the shippers. The cargo loss claimants and the insurance companies also claimed on appeal that the evidence showed that Old States had privity and knowledge of the unseaworthiness of the Pennsylvania. On March 22, 1956, soon *355 after the entry of the District Court's decree, Erskine Wood, the attorney for Old States in the litigation, sent J.R. Dant and Old States a letter in which he advised Dant that the possibility that the liability of Old States for the loss of the cargo would be limited by the court to the insurance coverage, and would not be in excess thereof, was a strong possibility, and that there was a reasonable expectation, about 80 percent, that Old States would not have a liability for the loss of the cargo in excess of the insurance coverage. The date of Wood's letter was 14 months before the Court of Appeals affirmed the decision of the District Court, on May 31, 1957. In his letter of advice on March 22, 1956, to J.R. Dant and Old States, Wood stated that the appeal to the Ninth Circuit Court of Appeals probably would not be argued until the fall of 1956, and probably would not be decided until January 1957, at the earliest. He stated also that the total amount of the insurance covering the Pennsylvania had been $1,331,400; that $401,376.13 of this amount had been paid in settlement of the claims for the loss of the crew and other expenses; and that the available balance of the insurance *356 to cover the cargo loss claims was $835,023.87, after the payment of legal fees and expenses of $95,000. The conclusion stated by Wood, in the letter of March 22, 1956, was as follows: I emphasize that I do not think you will ever be called upon to pay this. I feel quite confident that you will not. But no lawsuit is a certainty and it must be reckoned with as a possibility. However, I would not be scared by it, if I were you. If I had to put it in a percentage, I would say that you had about a 75% to 80% chance to win. I do not like the defeatism of a settlement, with its implications in the public mind that you were unwilling to refute in the Appellate Court the alleged unseaworthiness of the ship with its consequent loss of cargo and life. As the case stands now you have been held liable only up to the amount of the freight, $82,256.25, with interest and costs. The interest would be at six percent from January 5, 1952, to date, and the costs are undetermined as yet. The interest would amount to about twenty-five percent and the costs perhaps $5,000.00. Let us estimate, therefore, that the interest and costs would be $25,564.06. All of this is covered by insurance. Thus *357 far you have suffered no loss whatever and it is my hope and ambition to keep you that way. The District Court opinion of November 17, 1955, limiting Old States' liability to the pending freight (freight charges paid by the shippers), which was not in excess of the insurance protecting Old States from liability, according to a stipulation of the parties, was affirmed in all respects by the United States Court of Appeals on May 31, 1957, in States Steamship Company v. United States, 259 F. 2d 458 (C.A. 9, 1957). Petitions for rehearing were filed in the Court of Appeals by some of the cargo loss claimants on June 28, 1957, which was two days before June 30, 1957, the date on which Old States was merged into New States. New States had purchased all of the stock of Old States on July 11, 1956, for $11,050,000, and on June 30, 1957, Old States was liquidated and merged into New States. 145 The liquidation and merger of Old States was a statutory merger under Nevada statutes. New States received all of the assets of Old States and, in accordance with Nevada law, New States assumed all of the liabilities of Old States. On July 23, 1957, New States, successor *358 to Old States, also filed a petition for rehearing in the Court of Appeals in view of the other petitions for rehearing filed on June 28, 1957. The Court of Appeals granted a rehearing on the claimants' petitions, but denied the petition for rehearing filed by New States. On November 15, 1957, about 3 i/2 months after Old States was liquidated and merged into New States, the Court of Appeals changed its original opinion of May 31, 1957. The Court of Appeals held on November 15, 1957, that the District Court had erred in its ruling to the effect that the liability of Old States for the loss of the cargo was a limited one, which was limited to the pending freight, and it remanded the case to the District Court; 259 F. 2d 463. In its second opinion, on November 15, 1957, the Court of Appeals held that there had been a lack of due diligence on the part of Old States because there was a lack of due diligence on the part of its port engineer and acting marine superintendent, Lester A. Vallet, and the court charged Old States with privity and knowledge of the unseaworthiness of the Pennsylvania because of Vallet's lack of diligence. This conclusion was a complete reversal *359 of the Court of Appeals' earlier conclusions in its original opinion, on May 31, 1957, wherein it had concluded that Old States could not be charged with privity and knowledge of latent and potential weakness in the ship and, therefore, Old States' liability was limited. Contrary to its first conclusion, the Court of Appeals held in its second opinion on November 15, 1957, that Vallet had been negligent in failing to detect latent defects in the Pennsylvania; that Vallet was an "executive officer, manager or superintendent" of Old States whose authority included supervision over the phase of the business in which the loss had occurred; and that, therefore, the privity to or knowledge of the latent defects in the vessel, which caused the loss, was imputable to Old States through one of its supervisory personnel. The Court of Appeals accordingly reversed that portion of the District Court's decision, as well as its own conclusion of May 31, 1957, which had limited the liability of Old States under section 183(a) of the U.S. Code so that its liability was limited to the pending freight. The court remanded the case to the District Court for further proceedings consistent with its opinion *360 of November 15, 1957. Thereafter, New States filed another petition for rehearing in the Court of Appeals, which was granted. On August 20, 1958, the Court of Appeals further amended its original opinion of May 31, 1957, while adhearing to its conclusion in its opinion of November 15, 1957, which reversed the limitation of Old States' liability to the amount of the pending freight charges. The court's opinion of August 20, 1958, 259 F. 2d 470, was issued to clarify the court's conclusions in its opinion of November 15, 1957, holding that Old States, and since June 30, 1957, New States, was not protected by section 183(a) of the U.S. Code limiting the liability of the owner of a vessel. On January 12, 1959, the Supreme Court denied New States' petition for certiorari, and on February 24, 1959, it denied a petition for rehearing. States Steamship Company v. United States, 358 U.S. 993, and 359 U.S. 921. Thereafter, the cargo loss claims were settled by the parties in 1959. This settlement resulted in a liability owing by New States which New States was required to pay by virtue of the fact that Old States had been liquidated and merged into *361 New States under Nevada law on June 30, 1957. New States paid during 1959 the net sum of $1,445,394.22, which included interest and attorneys' fees, on account of the settlement of the cargo loss claims under the adverse court decision. This amount was claimed as a casualty loss deduction by New States in the 1959 consolidated return of Pacific Transport Company, and the deduction contributed to the net operating loss for 1959 reported by New States and by the affiliated group, which operating loss was carried back to 1957 and 1958 as loss carryback deductions. As stated before, in his review of the 1959 return of the affiliated group, for the purpose of determining whether the loss carryback deductions for 1957 and 1958 were allowable, respondent allowed New States a deduction for 1959 of the accrued interest on the cargo loss claims which were paid, $96,525.83, but he determined that the balance of the payments, $1,348,868.39, was not a proper current deduction and that the payments should be treated as a capital 146 expenditure, an additional cost to New States of the assets of Old States acquired through the liquidation and merger of Old States on June 30, 1957. Respondent's *362 allocation thereof is stated hereinafter. As noted above, after the first Court of Appeals decision (May 31, 1957) and two days after some of the cargo loss claimants had filed petitions with the Court of Appeals for a rehearing, Old States was liquidated and merged into New States on June 30, 1957. This liquidation and merger was pursuant to a resolution of the board of directors of New States dated June 24, 1957, which incorporated a plan for the liquidation of Old States and the merger of Old States into New States. Under this plan Old States was to distribute all of its assets to New States and the latter was to assume all obligations of Old States which were outstanding as of the date of the distribution of the assets of Old States to New States in the merger. This liquidation and merger was accomplished on June 30, 1957. Under section 78.540 of the revised Nevada Statutes, the merger of Old States into New States, and the vesting in New States of all of the assets of Old States was effected by the filing by New States with the Secretary of State of Nevada of a "Certificate of Ownership For Purpose of Merger of States Steamship Company" into New States. According to a stipulation *363 of the parties, that certificate was filed by New States on June 30, 1957. As of that date all of the assets of Old States were distributed to New States, subject to the then outstanding obligations and liabilities of Old States; New States assumed all of the obligations of Old States outstanding on June 30, 1957; and the distribution of all of its assets (subject to obligations) by Old States to New States was in complete cancelation and liquidation of all of the shares of stock of Old States. In effect, this meant that all of the shares of Old States were transferred to Old States by New States in exchange for Old States' assets, and the shares were canceled. Also, as of June 30, 1957, New States (States Line) changed its name from States Line to States Steamship Company, and operated under the latter name thereafter. After the Supreme Court denied New States' petition for certiorari on February 24, 1959, New States and the parties to the litigation, the claimants, entered into negotiations for the settlement of the claims and all of the parties agreed upon the total amount of principal and interest to be paid by New States. The settlement made it unnecessary for the District Court *364 to hear the case upon the remandment by the Court of Appeals. Under the settlement, New States paid the sum of $1,445,394.22 in 1959, which included the principal amount of $1,348,868.39, in payment of the cargo loss claims, attorneys' fees, and interest accrued on the judgment from July 1, 1957, to the date of payment by New States in 1959. Contingent Liability for Cargo Losses: The officers, directors, and the attorneys of Old States, including J.R. Dant and Erskine Wood, and later those in control of New States, and the accountants of both corporations, understood and believed that any and all liability of the corporations for damages for the loss of the cargo aboard the Pennsylvania was covered by the insurance carried by Old States and that, therefore, any liability in an amount in excess of the insurance covering that loss of property was very remote and was unlikely. The undetermined liability of Old States, and later of New States, was a contingent liability at all times, and a liability to claimants for a judgment for damages in excess of the insurance covearge of such loss was a remote contingent liability. The factors which contributed to the status of the liability as *365 a remote and contingent one were as follows: Section 183 of Title 46 of the U.S. Code, originally the Limited Liability Act of 1851, and later section 4285 of the Revised Statutes, was enacted to change the common law rule of absolute liability to the limited liability known as "liability without fault." Section 183, supra, limited or excused the carrier's liability under enumerated circumstances, and section 183(a) limited the owner-carrier's liability if the loss was due to a defect "without the knowledge of such owner". States Steamship Co. v. United States, 259 F. 2d 458, 464, supra. The purpose of that statute was to limit the liability for loss of a carrier under certain conditions. The second factor contributing to the contingent and remote nature of the possible liability was the fact that Old States was insured against loss and liability for loss. The third factor was that Old States continuously denied, and contested, the claim that its liability was more than a limited liability, liability without fault, under section 183(a), Title 46, U.S. Code, and that issue *366 was in litigation from July 13, 1954, the beginning of the trial of the case, until 147 February 24, 1959, when the Supreme Court rendered its final denial of review. The fourth factor was that the United States District Court decided on November 17, 1955, and the Court of Appeals affirmed that decision on May 31, 1957, to the effect that Old States was without fault with respect to latent defects in the Pennsylvania and, therefore, that it came within the provisions of section 183(a), supra, and that it had only a limited liability for the loss of the cargo, which liability was limited to the amount of the freight charges, $82,256.25, plus costs and interest of about $25,564.06. Old States' insurance covered that total amount of liability, which was less than the insurance coverage. The fifth factor was that under accepted principles of accounting, the accountants for Old States, under all of the circumstances described above, deemed a contingent liability which is covered by adequate insurance not to be a balance sheet liability as such or one for which a reserve account should be carried in the accounts of the corporation. Accordingly, the books of Old States, and later *367 of New States, did not contain a reserve or other account for a liability for the payment of the loss of the cargo; and the balance sheets of both corporations did not include a reserve for such contingent liability. For example: The balance sheet of Old States as of December 31, 1954, for 1954, prepared by George Black & Co., accountants, submitted to Old States on May 27, 1955, did not set forth any liability for the contingent cargo loss liability, and it included only a footnote, as follows: There have been cargo claims filed against the Company in the aggregate amount of $2,184,403.11 arising from the loss of a vessel at sea in 1952, all liability in connection with which is disclaimed by the Company. Decision by the Court is pending as to the Company's liability. Any losses arising therefrom, are, in the opinion of Company officials and its counsel, adequately covered by insurance. The same procedure was followed by the same accounting firm in preparing Old States' balance sheet for 1955, submitted to Old States on May 29, 1956, in which the following footnote was included: There have been cargo claims filed against the Company arising from loss of a vessel at sea in *368 1952 which, including interest, court costs, attorneys' fees, etc., aggregate approximately $2,900,000. A memorandum opinion issued by United States District Court, District of Oregon, in November 1955, indicated that the Company's liability extended only to the amount of freight charges involved, which is $82,256. Claimants have appealed from that decision but counsel for the Company has expressed opinion that the aggregate of any damages which may eventually be awarded will be within the amount of insurance coverage, approximately $835,000. Haskins & Sells, a nation-wide firm of certified public accountants, prepared Old States' audit report for 1956, and in the balance sheet as of December 31, 1956, the same procedure was followed and only a footnote was included about the cargo loss claims, in which it was stated that the officers and counsel of Old States were of the opinion that any eventual award by a court to claimants would be within the outstanding insurance coverage. In connection with the negotiations which culminated in Blyth's purchase of all of the shares of stock of Dant & Russell, Inc., on July 10, 1956, various financial reports of Dant & Russell, Inc., and of *369 its subsidiary, Old States, were submitted to Blyth & Co., in which no liability was set forth or reflected for the pending lawsuits of the cargo loss claimants. Although Blyth & Co. was advised by its attorneys that the existence of the cargo claims had not been disclosed in the financial reports and that Blyth could rescind, for that reason, its option agreement to purchase all of the shares of Dant & Russell, Inc., Blyth & Co. nevertheless purchased all of the shares of Dant & Russell, Inc. Upon the acquisition of all of the shares of Dant & Russell, Inc., Blyth then controlled its subsidiaries, including Old States. J.R. Dant negotiated with Blyth & Co. for the purchase of all of the shares of Old States, which were to be, and were, purchased by Dant's assignee, States Line (New States). States Line purchased all of the shares of Old States on July 11, 1956. J.R. Dant believed, on the advice of counsel, as well as on the basis of the favorable decision of the District Court on November 17, 1955, (which held that Old States' liability was a limited one) and on the basis of the insurance coverage, that the liability of Old States for the loss of cargo would not exceed the outstanding *370 insurance coverage. As part of the negotiations for the purchase from Blyth of the stock of Old States, Dant retained Haskins & Sells to study the financial position of Old States 148 (and of Pacific Transport Lines), and to make projections of the net earnings those corporations could expect from future operations. Pursuant to this employment, Haskins & Sells prepared and submitted a report entitled "Acquisition of Steamship Interests and Projection of Earnings," dated July 26, 1956. This report projected the net earnings of the corporations, including Old States, through the year 1961. This report included pro forma balance sheets both before and after the projected net earnings. The pro forma balance sheets did not show any reserve or other provision for the payment of the shippers' claims for lost cargo arising from the loss of the Pennsylvania, and the projected earnings did not reflect any deduction on account of the cargo loss claims. An explanatory comment accompanied the projection of net earnings wherein the following was stated: There are also suits and claims involving vessel and cargo damages and personal injuries arising in the normal course of business, which, *371 with the exception of deductible amounts provided for in the policies, are presumably covered by insurance. No consideration has been given to these suits and claims in the preparation of this projection. Haskins & Sells were aware of the pending cargo claims, but they were not taken into account in preparing the projections of net earnings because of the fact that Haskins & Sells had been advised by Dant's counsel that there was little likelihood of any liability beyond the insurance coverage. Early in 1957, in support of loan applications for Old States, New States, and Pacific Transport Co., financial and projected earnings statements were submitted to the Crocker-Anglo National Bank in San Francisco. No provisions were made in any of those financial and projected earnings statements for any loss from the Pennsylvania cargo loss claims and litigation either by means of a contingent liability, a reduction of surplus, a deduction from income, or otherwise. On June 26, 1957, the Crocker-Anglo Bank committed itself by a letter to make loans aggregating $8,000,000 to New States and to Pacific Transport Co., apparently accepting the financial and projected earnings statements as correctly *372 reflecting the financial position of Old States, New States, and Pacific Transport Co. In connection with an application of Old States on March 9, 1955, to the Maritime Commission (Marad) for an operating-differential subsidy agreement (as Old States was not a subsidized carrier), Old States, and later New States, submitted several statements of contemporaneous financial condition and projections of future earnings to Marad in support of the application for a subsidy. Old States had acquired on October 22, 1954, all of the stock of Pacific Transport Lines, Inc., which held an operating-differential subsidy agreement with Marad. There was not any provision in the financial and projected earnings statements submitted to Marad for any loss from the cargo loss claims and litigation by means of a contingent reserve, reduction of surplus, deduction from income, or otherwise. However, Marad was continuously aware of the litigation of the claimants for compensation for their losses of cargo on the Pennsylvania. Prior to the liquidation and merger of Old States into New States, New States was substituted for Old States as the applicant for the subsidy. On August 23, 1957, Marad granted the *373 subsidy application and an operating-differential subsidy agreement was executed on that date between Marad and New States. Purchase of Stock of Old States: J.R. Dant negotiated with Blyth & Co., on behalf of States Line (New States) for the purchase of all of the stock of Old States, and he also was obliged to submit a bid to Blyth for the stock. There were three bidders for the stock of Old States, including J.R. Dant. Dant's bid for Old States' stock, of $11,050,000, was accepted by Blyth & Co. in a competitive situation involving the three bidders. The eventual sale of all of the stock of Old States to Dant's assignees, States Line (New States) on July 11, 1956, was an arms-length transaction in which the selling price of $11,050,000 represented the fair market value of all of the shares of stock of Old States. The cost of the shares to New States was $11,050,000, plus legal expenses of $58,843.43. In accepting Dant's bid of $11,050,000, Blyth & Co. was not under any compulsion to accept Dant's bid, which was made with the intention that his assignee, New States, would purchase Old States' stock. Moreover, Blyth & Co. was in the position of having three competitive bids for *374 the stock. Furthermore, J.R. Dant was motivated by business considerations, rather than by some sort of familial loyalty considerations, in making the bid of $11,050,000 for Old States' stock. Dant's bid for the stock of Old States, as stated above, was not reduced in any 149amount to provide for any contingent liability of Old States for the pending claims of the shippers of the lost cargo which were the issue in the lawsuits for those claims. In his negotiations with Blyth & Co. for the purchase of all of the stock of Old States, J.R. Dant did not discuss the cargo loss claims, and he did not attempt to negotiate a lower price for the shares on account of any contingent liability of Old States for the cargo loss. Assets Acquired by New States from Old States, June 30, 1957: Respondent determined that the payments in 1959 in settlement of the adverse court decree to the lost cargo claimants represented a capital expenditure rather than a deductible casualty loss. He then allocated the capitalized expenditure to and among various assets. An alternative issue relates to respondent's allocation determinations. Just prior to the time when New States and Old States were merged *375 and Old States was liquidated, on June 30, 1957, Old States had three subsidiaries, wholly owned, Pacific Transport Lines, Inc. (PTL), Portland Stevedoring Company, and Quaker Line, Inc. Also, Old States owned the majority of the shares of California Eastern Lines, Inc., 1,202 shares out of 2,276 shares. Upon the liquidation and merger of Old States, New States acquired the assets of Old States, and among them were the shares of stock owned by Old States of the four corporations named above, so that PTL, Portland Stevedoring, and Quaker became subsidiaries of New States. By the end of August 1957, New States acquired the balance of the shares of California Eastern, when it then became New States' subsidiary. On August 23, 1957, PTL was liquidated and merged into New States. In that merger, the basis to New States of the assets acquired from PTL was determined under section 334(b)(1), 1954 Code. The tax consequences of that transaction are not in issue here. During 1957, New States dissolved Quaker Line in a nontaxable transaction. On October 29, 1957, New States sold all of the capital stock of Portland Stevedoring Co. to Pacific Atlantic Steamship Co. (Pacat) for cash. On March 31, 1958, California *376 Eastern Lines, Inc., was liquidated and merged into New States. The parties are agreed that New States' liability for the payment of the cargo claims under the court's judgment and decree, $1,348,868.39, accrued on February 24, 1959, and that if any portion, or all, of the above sum is to be capitalized, such capitalization of that sum must be made as of February 24, 1959. If the alternative issue of the respondent's capitalization as of February 24, 1959, of the above payment in 1959 were to be considered, there would be a question whether such capitalization, as of February 24, 1959, shall be allocated to and apportioned among the assets owned by New States on that date which are traceable to the assets of Old States which were acquired by New States on June 30, 1957, as petitioners claim; or whether the allocation of the capitalized expenditure as of February 24, 1959, should be made only to the assets originally received by New States on June 30, 1957, without regard to whether those specific assets still were in existence on February 24, 1959, which in effect is respondent's determination. Respondent's claimed allocation of a capitalized $1,348,868.39, as of February 24, 1959, is *377 allocation of that sum to the following: Vessels
$333,447.42
Stock of Pac. Trans. Lines
972,659.42
Stock of Portland Steve. Co 42,761.55 $1,348,868.39
On February 24, 1959, the stock of Pacific Transport Lines, Inc. (PTL) was not in existence because that corporation had been liquidated and merged into New States on August 23, 1957. On February 24, 1959, the stock of Portland Stevedoring Co. was not owned by New States, but was owned by Pacific Atlantic Steamship Co. (Pacat), which had purchased the stock from New States for cash on October 29, 1957. Respondent's method of allocating a capitalized sum of $1,348,868.39, as of February 24, 1959, represents an allocation of more than 70 percent thereof to assets which no longer existed, or were not owned by New States, on February 24, 1959. On February 24, 1959, New States owned and possessed 12 vessels. Four of those vessels were acquired by New States from Old States when Old States was merged into New States, and liquidated. Eight of those vessels were acquired by New States from Pacific Transport Lines, Inc. (PTL), which had been a subsidiary of Old States, when PTL was merged into New States, and liquidated, *378 on August 23, 1957. There is in evidence a schedule prepared by petitioners which reflects a method of allocating a capitalized sum of $1,348,868.39, if that were to be done, to and among the 150 eight vessels mentioned above which New States owned on February 24, 1959. In that schedule (exhibit 57 of petitioners) all of the above sum would be allocated to and among those eight vessels, which are traceable to the assets of Old States which were acquired by New States. If such allocation of $1,348,868.39 were to be made, each one of those eight vessels would receive an increased basis, of a proportion of the above sum, and New States would receive allowances for additional depreciation for 1959, with respect to those eight vessels, in the total amount of $165,998, which would be additional depreciation of $120,698.40, because the depreciation for 1959, of the eight vessels, allowed by the respondent amounted to $45,299.60. Ultimate Findings of Fact, Cargo Loss 1. The liability of Old States, and of its successor, New States, for loss of cargo aboard the Pennsylvania was contested by both corporations and was in dispute on the critical dates, July 11, 1956, date of purchase *379 of stock, and June 30, 1957, date of merger and liquidation, and thereafter until February 24, 1959. The liability was founded upon and governed by a statute, section 183 of Title 46, U.S. Code, and it arose out of the contracts of Old States with the shippers of the cargo. The cargo loss claims were not tort claims. 2. The contested and disputed liability of Old States, and of its successor, New States, for the loss of cargo did not become established and fixed and did not become certain as to amount, until on and after February 24, 1959, on which date the liability became accrued. 3. The liability of Old States was a contingent liability. The contingencies related to and involved the statutory limitations contained in section 183, Title 46, U.S. Code, which prescribed limited liability, and the existing insurance coverage. Since a limited liability was fully covered by Old States' insurance, the liability of Old States, and later of New States, was a remote as well as a contingent liability on July 11, 1956, when New States purchased the stock of Old States, and on June 30, 1957, when Old States was liquidated and merged into New States. On both of those dates the belief of the *380 officers of Old States and of New States, respectively, that the then pending litigation would result in a judicial determination that Old States' liability for the loss of the cargo was a limited liability which would be fully covered by the existing insurance, and that the determined liability would not be in an amount in excess of the insurance, was a reasonable belief. 4. The price, $11,050,000, paid by New States for all of the stock of Old States was not a price arrived at on the basis of a discount and reduction of some larger amount to allow for a reserve in any amount for the contingent, cargo-loss liability. It was not a discounted price, and Old States, and later New States, did not set up on their books any reserve for such contingent liability. 5. The sum paid by New States in 1959 in settlement of the decree awarding compensation to the claimants for the loss of their cargo, $1,348,868.39, exclusive of interest, was not part of the cost of the stock of Old States, or of any of the assets of Old States acquired by New States as a result of the liquidation and merger of Old States. 6. The sum, $1,348,868.39, paid by New States in 1959 to the claimants was a loss, *381 not compensated for by insurance or otherwise, which was fully deductible in 1959. New States Deposits for 1959 in Marad Account In the 1959 consolidated return, in reporting its own income and deductions, New States deducted $2,074,028.43 as "deposits of tax-deferred earnings in reserve funds". This deduction was part of the total amount of all of the deductions totaling $7,959,162.74. Since the total income reported by New States was $6,527,894.96, the total amount of all of the deductions resulted in a net operating loss of $1,431,267.78. As stated hereinbefore, the respondent made an adjustment in the amount of the deduction of $2,074,028.43 for Marad deposits, upon his audit of the 1959 net operating loss, whereby he reduced the deduction for the Marad deposits from $2,074,028.43 to $2,021,003, and he disallowed $53,025.43. Thus, he appeared to "allow" a deduction for Marad deposits of $2,021,003, but the figure, $53,025.43, was only an "adjusting" figure to make the allowed deductions, $6,527,894.96, the same amount as income, so that New States would have neither a profit nor a loss from its operations for 1959. Respondent adopted the position that the so-called "voluntary *382 deposits" with Marad to reserve funds under section 607 of the Merchant Marine Act, $1,175,000, could not 151 exceed the amount of "taxable income", and his disallowance of a deduction of $53,025.43 was in fact a denial of a deduction for part of the deposit of $1,175,000. Under respondent's theory, the figure $53,025.43 is subject to further adjustment up to $1,175,000 depending upon the decision here relating to other disputed deductions. However, as explained hereinafter and in detail in the Opinion, under respondent's theory, the figure $53,025.43 is subject to further adjustment up to $2,074,028.43, which could be disallowed by respondent, depending upon the decisions here relating to other disputed deductions. The issue about Marad deposits involves the deposits with Marad of $2,074,028.43. The figure, $2,074,028.43, the total deposits in 1959 by New States with Marad into reserve funds, is the sum of four types of Marad deposits as follows: The so-called voluntary deposits
$1,175,000.00
Excess profits, 1959
591,701.97
1959 interest accumulated in fund
32,563.14
Net depreciation on vessels 274,763.32
$2,074,028.43
It is necessary to state *383 under this issue the amounts reported by New States as its total income for 1959, and the total amounts of the allowed and disallowed deductions, respectively, as follows: Total income
$6,527,894.96
Allowed deductions
$6,527,894.96
Disallowed deduc- tions 1,431,267.78
7,959,162.74
Net operating loss
($1,431,267.78)
The deductions allowed by respondent were for salaries, wages, depreciation, bad debts, repairs, rents, taxes, interest, pension contributions, and similar business expenses. The following explains the items of the disallowed deductions totaling $1,431,267.78: Disallowed deductions
Depreciation (in issue)
$ 24,411.10
Cargo loss payments
1,348,868.39
Marad deposits
53,025.43
Initiation fees (not in issue)
4,450.00
Filing fees (not in issue) 512.86
$1,431,267.78
The finding made above that the payment of $1,348,868.39 to settle the claims for the lost cargo was a fully deductible loss in 1959, reduces the total sum of the deductions denied by the respondent from $1,431,267.78 to $82,399.39. Respondent determined that New States, as a member of the affiliated group, did not have any net operating loss for *384 1959. The finding that the total cargo loss payment was deductible means that New States had a net operating loss of at least $1,348,868.39. On January 1, 1953, Pacific Transport Lines, Inc., entered into an "operating-differential subsidy agreement", Contract FMB-21, with the Maritime Administration, after hearings held to determine whether Pacific Transport Lines qualified for the subsidy. The operating-differential subsidy agreement was granted to Pacific Transport Lines by Marad in accordance with section 607 of the Merchant Marine Act, 1936, as amended, 46 U.S.C.A. 1177. On October 22, 1954, Old States acquired all the stock of Pacific Transport Lines, Inc. Old States was not a subsidized carrier on this date. It has been stipulated that a principal purpose of Old States in this acquisition was to become a subsidized carrier through amendment of the subsidy contract of Pacific Transport Lines to include routes operated, and ships owned, by Old States. Prior to the acquisition of all of the outstanding capital stock of Pacific Transport Lines by Old States on October 22, 1954, Old States obtained approval of that transaction from Marad. Marad's approval *385 was required if the operating-differential subsidy agreement (Contract FMB-21) was to continue in effect. On March 9, 1955, Old States applied to Marad for an operating-differential subsidy for its operations (routes and ships) previously conducted by Old States, but not within the scope of operations encompassed in Contract FMB-21, the operating-differential subsidy agreement between Marad and Pacific Transport Lines, Old States' subsidiary. On July 11, 1956, New States (then States Line) acquired all of the outstanding stock of Old States, and on June 30, 1957, Old States was liquidated and merged into New States. Prior to this liquidation and merger, Marad authorized the substitution of New States for Old States under the original application for an operating-differential subsidy agreement. Pacific Transport Lines, a subsidiary of Old States, became a subsidiary of New States as a result of the merger of Old States into New States on June 30, 1957. On August 23, 1957, New States caused Pacific Transport Lines to be liquidated and merged into New States. New States acquired, by operation of law, all of the rights and assets of Pacific Transport and assumed all of its obligations *386 including, without limitation, all of the rights and obligations of Pacific Transport under its 152 subsidy agreement with Marad. Prior to the liquidation of Pacific Transport, Marad notified New States that its application for a subsidy agreement, submitted by Old States on March 9, 1955, would be granted, and on August 23, 1957, Marad granted a subsidy agreement to New States, as Addendum 19 to Contract No. FMB-21, the subsidy agreement with Pacific Transport Lines. That contract and addendum became effective for New States for the period August 23, 1957, to December 31, 1957. In addition to that short-term agreement, New States was granted a subsidy agreement, Contract No. FMB-62, for the period January 1, 1958, to December 31, 1977. On August 23, 1957, New States and Marad also entered into a letter agreement concerning the subsidy agreement which stated in part the following: In acting on the application dated March 9, 1955, as amended December 14, 1955 and July 30, 1957, filed by States Steamship Company and its predecessor corporation, for the award of an operating-differential subsidy agreement to cover the operations of cargo vessels on Trade Routes Nos. 29 and 30, the *387 Federal Maritime Board, as a condition precedent to the granting of said application and the execution of Addendum No. 19 to Contract No. FMB-21 and Contract No. FMB-62, required the acceptance by States Steamship Company of the following provisions: * * * C. States Steamship Company shall make annual deposits in the statutory reserve funds of mandatory deposits of excess profits and voluntary deposits of free earnings totaling not less than $1,200,000 per annum, on a cumulative basis for the eight year period (1958-1965 inclusive), provided that the United States: The operating-differential subsidy agreement was granted to New States in accordance with the provisions of the Merchant Marine Act of 1936, as amended. Under section 607 of the Act, as amended, the contract with New States required the establishment of two funds with Marad, the capital reserve fund and the special reserve fund. The purpose of the capital reserve fund was to insure the prompt payment of New States' obligations to the United States, and to insure the replacement of the contractor's (New States') subsidized vessels as might be required. The purpose of the special reserve fund was to insure the continued *388 maintenance and successful operation of the subsidized vessels, and to insure that the contractor had sufficient funds to meet the general operating expenses or losses of the subsidized operations. The reserve funds are essentially joint accounts under the control of the contractor (New States) and Marad. Certain provisions of the subsidy agreement, and of the Act, required that New States would make deposits into these reserve funds. Certain deposits to reserve funds by the contractor, in accordance with the provisions of the contract and the Act, are given beneficial tax treatment under section 607(h) of the Merchant Marine Act. Section 123 (a)(7), 1954 Code, refers by a cross-reference to section 607(h) of the Merchant Marine Act. Section 123(a)(7) of the Code and section 607(h) of the Act provide that certain deposits to the reserve funds with Marad shall be exempt from all Federal taxes. Section 123(a)(7) of the Code states that earnings of ship contractors deposited in special reserve funds *389 shall be excluded from gross income and, therefore, shall be exempt from tax according to section 607(h) of the Merchant Marine Act. Section 123(a) of the Code is part of subtitle A, Ch. 1B, Part III of the 1954 Code. Part III contains various items which are "specifically excluded from gross income", including the item described in section 123(a). Chapter 1B of Subtitle A of the Code deals with gross income, adjusted gross income, and taxable income, and with items included and excluded, respectively from gross income. The deposits to reserve funds administered by Marad which are given beneficial tax treatment are described in section 607 of the Merchant Marine Act. The letter agreement of August 23, 1957, between Marad and New States required New States to make deposits to reserve funds of not less than $1,200,000 per year on a cumulative basis. The deposits of New States were to consist of either mandatory deposits of excess profits, or so-called voluntary deposits of free earnings. In the Merchant Marine Act and the regulations of Marad there are definitions of excess profits and *390 of free earnings. Excess profits from subsidized operations are defined as annual profits in excess of 10 percent of the capital necessarily employed in the subsidized operations. Under certain provisions of the Act, annual profits from subsidized operations in excess of 10 percent of the capital necessarily employed in subsidized operations, the excess profits, are subject to being recaptured in part by Marad. 153 Generally, 50 percent of the excess profits from subsidized operations are recaptured by Marad. Under certain provisions of the Act, parts of the remaining 50 percent of excess profits may be required by Marad to be deposited in the contractor's capital reserve fund administered by Marad. Free earnings are defined in Marad's regulations as those annual profits from subsidized operations which do not exceed 10 percent of the capital necessarily employed in the subsidized operations of the operator's business. Section 607 of the Merchant Marine Act, as amended, provides, in part, as follows: *391 Profits; reserve funds - Percentage of net profits permitted for distribution (a) Every contract for an operating-differential subsidy made under authority of this subchapter shall provide that the contractor shall be entitled to annually withdraw from net earnings of subsidized vessels and services incident thereto as profit, if the contractor is a natural person or a partnership, or may pay to its shareholders or stockholders, as dividends, if the contractor is an association or corporation, a sum not in excess of 10 per centum per annum on the contractor's capital necessarily employed in his business, except subject to the further provisions of this section which likewise shall be incorporated in such contract. Capital reserve fund; deposits required. (b) To insure the prompt payment of the contractor's obligations of the United States and the replacement of the contractor's subsidized vessels, as may be required, the contractor shall create and maintain, out of gross earnings, during the life of such contract, a "capital reserve fund", in such depository or depositories as may be approved by the Secretary of Commerce. In this fund the contractor shall deposit annually or oftener, *392 as the Secretary may require, an amount equal to the annual depreciation charges on the contractor's vessels on which the operating differential is being paid, * * * Provided, however, that, if, during any accounting year, the annual depreciation charges of the contractor's line of subsidized vessels has not been earned in whole or in part over and above the annual expense of operation of such vessels (exclusive of said annual depreciation thereon, the contractor shall not be required to deposit in his capital reserve fund for such accounting year a sum in excess of the amount of annual depreciation actually earned during that year but shall make up any and all deficiencies in his capital reserve fund as soon as the earnings of his subsidized vessels in excess of annual expenses of operation shall permit. The proceeds of all insurance and indemnities received by the contractor on account of total loss of any subsidized vessel and the proceeds of any sale or other disposition of such vessel shall also be deposited in the capital reserve fund. The contractor shall also deposit in the capital reserve fund, from time to time, such percentage of the annual net profits of the contractor's *393 business covered by the contract as the Secretary of Commerce shall determine is necessary to further build up a fund for replacement of the contractor's subsidized ships; but the Secretary shall not require the contractor to make such deposit of the contractor's net profits in the capital reserve fund unless the cumulative net profits of the contractor, at the time such deposit is to be made, shall be in excess of 10 percentum per annum from the date the contract was executed. * * * Special reserve fund; deposits; disbursements permitted (c) To attain the public objects for which the financial aid provided for in such contract is extended and to insure the continued maintenance and successful operation of the subsidized vessels, the contractor shall create and maintain, during the life of such contract, a "special reserve fund" in such depository or depositories as the Secretary of Commerce shall approve. If the profits, without regard to capital gains and capital losses, earned by the business of the subsidized vessels and services incident thereto exceed 10 per centum per annum and exceed the percentage of profits deposited in the capital reserve fund, as provided in subsection *394 (b) of this section, the contractor shall deposit annually such excess profits in this reserve fund. * * * Rules and regulations for administration of reserve funds; investment of funds (d) The Federal Maritime Board or Secretary of Commerce shall adopt and prescribe rules and regulations for the administration of the reserve funds contemplated by this section and shall include therein a definition of the terms "net earnings" and the term "capital necessarily employed in the business", as such terms are employed in this section: * * * Increase and transfer of reserve funds; interest on overpayment of taxes (g) With the approval of the Secretary of Commerce, the contractor may voluntarily increase the amount of either or both reserve funds by depositing in such fund or funds any or all of the earnings 154 otherwise available for distribution to stockholders, or may transfer funds from the special reserve funds to the capital reserve fund. If a voluntary deposit of earnings approved by the Secretary under this subsection after December 31, 1950, results in an overpayment of Federal taxes for any year, interest shall not be allowed on such overpayment for any period prior *395 to the date of approval of the deposit by the Secretary. Exemption of reserve funds from taxation (h) The earnings of any contractor receiving an operating-differential subsidy under authority of this chapter, which are deposited in the contractor's reserve funds as provided in this section, except earnings withdrawn from the special reserve funds and paid into the contractor's general funds or distributed as dividends or bonuses as provided in paragraph 4 of subsection (c) of this section, shall be exempt from all Federal taxes. Earnings withdrawn from such special reserve fund shall be taxable as if earned during the year of withdrawal from such fund. * * * In addition to the provisions of the Act, and the contracts of New States, Nos. FMB-21 and FMB-62, New States was also subject to the provisions of a closing agreement which became effective in January 1958, as is explained hereinafter. It is stipulated that on June 10, 1953, and August 3, 1953, Pacific Transport Lines and the Commissioner of Internal Revenue executed a closing agreement as to a final determination covering specific matters under section 3760 of the 1939 Code. This closing agreement was approved by the *396 Acting Secretary of the Treasury on September 3, 1953. The closing agreement relates in part to the tax treatment of deposits into reserve funds with Marad. Essentially, in this regard, the closing agreement provided that "all earnings, including capital gains, (not tax exempt under the Internal Revenue Code), which are deposited in the taxpayer's Reserve Funds, shall be tax-deferred income." The above closing agreement between Pacific Transport Lines and the Commissioner was in effect on October 22, 1954, when Old States acquired all of Pacific Transport Lines' stock, and also on June 30, 1957, when New States acquired all of the stock of Pacific Transport Lines in the liquidation and merger of Old States into New States. On or about the date Pacific Transport Lines was liquidated and merged into New States, August 23, 1957, New States filed a request that the closing agreement between Pacific Transport Lines and the Commissioner should be continued with New States as a recognized party in interest. It is stipulated by the parties that on January 14, 1958, the Commissioner notified New States, in response to its request, that the closing agreement between the Commissioner and *397 Pacific Transport Lines was to continue in effect, with New States becoming a recognized party in interest under that closing agreement. In a letter from the Commissioner to New States dated January 14, 1958, the following was stated: * * * it is the opinion of this office that, as successor to Pacific, States acquired the rights and incurred the obligations of Pacific under Pacific's closing agreement with the Commissioner of Internal Revenue relative to the operating differential subsidy agreement awarded Pacific by the Federal Maritime Board. Accordingly, your understanding that States has become and is recognized as a party-in-interest under said closing agreement is hereby confirmed. Under the circumstances, the entering into a separate closing agreement by States and the Commissioner will not be necessary. The closing agreement, executed in 1953 by Pacific Transport Lines and the Commissioner, which continued in effect with respect to New States as of January 14, 1958, provided in part as follows: I. Definitions As used herein, unless otherwise stated, the following quoted terms shall mean: (a) "The Act" means the Merchant Marine Act, 1936, or that Act as amended, *398 as the case may be. * * * (c) "Reserve Funds" mean Capital Reserve Funds or Special Reserve Funds established under and for the purposes stated in section 607 of the Act. (d) "Tax deferred" or "Tax deferment" referring to ordinary income and capital gains deposited in Reserve Funds means that such items are not to be recognized as taxable income, except as provided in paragraph VI(C) hereof, and likewise are not to be recognized in the determination of cost basis or invested capital. (e) "Ordinary income" means taxable income other than capital gains. * * * 155 II. Tax treatment of deposits in reserve funds All earnings including capital gains, (not tax exempt under the Internal Revenue Code), which are deposited in the taxpayer's Reserve Funds, shall be tax deferred income; provided, however, that the taxpayer shall not be bound by this commitment beginning with the calendar year in which a decision of any court, sustaining the contention that Section 607(h) of the Act gives a tax exemption, instead of a tax deferment as herein provided, shall become final. * * * VI. Allocation of deposits in Reserve Funds: * * * (b) Any deposit of income in the taxpayer's Reserve *399 Funds, which is not tax deferred by paragraph I(d) shall be treated as capital for all purposes and shall not be taxed upon withdrawal or otherwise. (c) Any withdrawal made by the taxpayer from its Reserve Funds, either before or upon termination of its operating-differential subsidy contract with the Administration, shall be taxable as if earned during the year of such withdrawal, to the extent, as determined under subparagraph (a) hereof, that such withdrawal consists of ordinary income or capital gains tax deferred under this agreement. On June 24, 1952, Marad issued a statement entitled "Maritime Administration Policy on the Approval of Applications for Voluntary Deposits in the Capital Reserve Funds". In this statement the Maritime Administrator, E.L. Cochrane, stated his intention to approve the recommendations of the Working Group on Voluntary Deposit Policy. The Working Group on Voluntary Deposit Policy had made a study of the merchant marine operating under subsidy agreements with Marad, and the observations and recommendations of the Working Group which were accepted by Marad are, in pertinent part, as follows, pp. 10, 14, 15: Obviously, the capital reserve funds *400 must be increased. The 1936 Act recognizes the need to build up those funds for replacement purposes. Section 607(g) authorizes voluntary deposits and section 607(h) authorizes earnings voluntarily deposited to be tax free, with certain exceptions. * * * RECOMMENDATION: I. After considering all phases of this very important and difficult subject, it is recommended that the Administrator approve voluntary deposits on the basis of the following formula. * * * D. If there is a deficit between the funds required and the funds available, voluntary deposits be allowed in an amount, which when added to that part of the estimated tax savings on such deposit not subject to recapture, would be equal to such deficit; E. That subsidized operators be required, whenever possible to make deposits to the capital reserve fund to meet the minimum 25% down payment of replacement ships and be allowed permissive voluntary deposits in an amount sufficient to bring available funds up to 35% of the replacement costs to meet future impairment of capital reserve funds resulting from cyclical periods of depressed profits or operating losses. By letter dated May 29, 1958, Marad modified its voluntary *401 deposit policy, stating as follows: Voluntary deposits will be permitted in such amounts (if any) as are required to increase funds available under the foregoing formula to not in excess of (a) 25 percent of replacement costs of those vessels with respect to which replacement obligations have not been assumed by contract and (b) the replacement costs of those vessels with respect to which replacement obligations have been assumed by contract, * * * On March 18, 1960, New States made a written request to Marad for approval to make a deposit of not less than $1,175,000 and not more than $1,200,000 into its capital reserve fund out of its free earnings for the year 1959. The purpose of the deposit was to provide for reserve funds to pay for the new vessels for which New States had entered into a contract. New States and Marad had entered into a contract with Newport News Shipbuilding & Dry Dock Company for the construction of four Mariner-type vessels on February 29, 1960. In the above request to make the deposit out of free earnings New States set forth its profits from its subsidized operations in 1959 as follows: Loss before subsidy subsidized operations
($2,872,691.50)
Gross subsidy receipts 5,396,172.73
Profit before recapture (subsidized net earnings)
$2,523,481.23
Free earnings, 10% of capital necessarily employed 1,349,296.50
Excess profits
$1,174,184.73
Less recapture 587,092.37
Company's one-half of excess profits, depositable in special reserve fund upon collection of applicable subsidy
$ 587,092.36
*402 By a letter dated July 19, 1960, Marad gave New States its approval to make a deposit into its capital reserve fund out of free earnings in an amount not to exceed $1,200,000. In that letter, it was provided that "in the event said subsidized 'free earnings' (after audit) are less than the amount so deposited, said voluntary deposit shall be reduced to the amount of the actual subsidized 'free earnings' for calendar year 1959 by off-set against future mandatory deposits." On July 26, 1960, pursuant to the approval of Marad, New States deposited $1,175,000 into its capital reserve fund. Although the deposit was made in 1960, it was a deposit of earnings or amounts received by New States in 1959, and the parties are agreed that if the deposit of $1,175,000 is deductible, or excludable, from income, in whole or in part, the deduction or exclusion, is to be taken into account in computing the income of New States for 1959. Likewise, the balance of the $2,074,028.43 in issue, or $899,028.43, is to be taken into account in 1959. New States made or accrued deposits in 1959 in its reserve funds with Marad in the total sum of $3,487,613, as follows: 1959 depreciation on capital assets
$1,410,887.55
Marad adjustments, 1957 and 1958 depreciation 2,696.75
1,413,584.30
Total of several other deposits 2,074,028.43
$3,487,612.73
*403 The parties are agreed that the deposits totaling $1,413,584.30 are not entitled to be treated as tax deferred income, or as exclusions from 1959 income. Those deposits represented deposits of capital. The deposits in Marad reserves totaling $2,074,028.43 were deposits which were authorized or required as deposits to reserve funds by the Merchant Marine Act. These deposits were made from 1959 subsidized net earnings of New States. The $2,074,028.43 is the sum of the following deposits in 1959 in reserve funds with Marad: 1. Interest earned on deposits in reserve funds
$32,563.14
2. Excess profits:
Adjustments of prior years
4,609.61
Year ended Dec. 31, 1959
587,092.36
3. Voluntary deposits
1,175,000.00
4. Depreciation:
Total per books and deposited in reserve funds
$1,685,650.87
Less depreciation allowable for tax purposes 1,410,887.55
* 274,763.32
$2,074,028.43
Items 1, 2, and 4, in the above schedule, aggregate $899,028.43: 1.
$ 32,563.14
2
4,609.61
587,092.36
4 274,763.32
Total
$899,028.43
*404 Respondent has allowed the above deposits of 1959 earnings of $899,028.43 as "deductions" of New States for its taxable year 1959. On the basis of his determinations with respect to claimed deductions of New States for 1959, he has determined that of the so-called voluntary deposits of $1,175,000 of 1959 earnings, the amount of $53,025.43 was not entitled to tax-deferred treatment (i.e., was not an allowable "deduction"). The amount computed by respondent as an unallowable deduction, $53,025.43, was an adjusting figure which brought into balance the 1959 income of New States and the total allowable deductions, so that New States did not have income or loss for 1959, since income and allowed deductions amounted to the same figure, $6,527,894.96. Respondent's explanation of his treatment of $1,175,000 was that the deduction for the deposit would be limited to the extent that the deposit did not exceed the amount of the finally determined taxable income of New States for 1959, computed without any deduction for the deposit of $1,175,000. In the deficiency notice, respondent determined that other deductions were not allowable, deductions for depreciation and the payments of the cargo *405 loss claims, and, therefore, New States had taxable income 157 of $1,121,974.57, without any deduction for the deposit of $1,175,000. He disallowed the deduction for the deposit to the extent of $53,025.43, the excess of $1,175,000 over taxable income of $1,121,974.57. According to respondent's theory, the amount which could be deducted for the deposit is an adjustable figure which depends upon the finally determined amount of New States' income for 1959, determined without any adjustment for the deposit, either as a deduction or exclusion from income. Respondent has not determined what adjustments would be made if the deductions which he has disallowed are allowed here. For example, the cargo loss deduction claimed by petitioners is in the amount of $1,348,868.39. If this amount is determined to be an allowable deduction here, "taxable income" as determined by respondent, $1,121,974.57, would be reduced to an operating loss figure. In that event, according to respondent's theory, all of the voluntary deposit of $1,175,000 would be in excess of "taxable income" and would be an unallowable deduction. Also, as a logical consequence of respondent's theory of disallowing the "deductions" *406 for deposits to reserve funds to the extent that the adjustment results in a balancing of New States' income for 1959 with its deductions, part or all of the other deposits to Marad reserve funds, totaling $899,028.43, would be disallowed by respondent, if the claimed deductions for cargo loss payments and depreciation in issue are determined here to be allowable deductions and produce a negative "taxable income" or, in other words, an operating loss for New States in 1959. Under respondent's theory, the "deductions" for the deposits of $899,028.43 would be unallowable as deductions to the extent that there was an operating loss, thereby bringing New States' income and deductions into balance for 1959. As the result of respondent's theory and the facts of this case relating to the claimed "deductions" for cargo loss payments attributable to the loss of the Pennsylvania and relating to depreciation deductions, all of the deposits to Marad's reserve funds in 1959 in the amount of $2,074,028.43 are in issue. New States, in the 1959 return, treated its several deposits for 1959 to Marad reserve funds as deductions from income. A "deduction" of the deposits of $2,074,028.43 appeared *407 to contribute to the net operating loss of New States for 1959, but that treatment was due to an accounting procedure of Marad, and to the method employed in preparing the tax return. However, if the deposit of earnings of $2,074,028.43 to the Marad reserve funds had been treated as an exclusion from New States' income, rather than as a deduction, the 1959 net operating loss of New States would have been the same, $1,431,267.78, as the following schedule shows, and the net operating loss would be the result of operating expenses of the unsubsidized business. Income
Earnings from operations
$1,457,543.09
Other income, includ- ing Marad subsidy, $4,809,080.36 5,070,351.87
$6,527,894.96
Less deposit of earnings to Marad capital reserve fund as an ex- clusion of tax-deferred income 2,074,028.43
Total income
$4,453,866.53
Deductions
* 5,885,134.31
Net operating loss
($1,431,267.78)
*408 During 1959, New States received subsidy payments from Marad in the net amount of $4,809,080.36 under the subsidy contract. New States was obliged to report, and did report, the subsidy payment of $4,809,080.36 in its gross income. Under Marad's accounting, New States had free earnings in 1959 in the amount of $1,349,296.50. Since it had free earnings in that amount, Marad approved New States' payment of $1,175,000 to the capital reserve fund. For 1959, New States' gross income was $6,527,894.96, including the subsidy receipts of $4,809,080.36, but its gross taxable income was $4,453,866.53, after the exclusion of the deposits of $2,074,028.43. The deposits of $2,074,028.43 were from subsidized net earnings for 1959, which amount to $2,523,481.23. Part III, Ch. 1B of Subtitle A, 1954 Code, sets forth various items which are "specifically excluded from gross income", among which are deposits of ship contractors (section 123(a)(7)) in special reserve funds with the Maritime Administration (Marad), referred to in section 607(h) of the Merchant Marine Act. For 1959, New States had net *409 subsidized earnings and gross income for the purposes of section 607(h), Merchant Marine Act, and section 123(a)(7) 158 of the Code, in the amount of at least $2,074,028.43. That amount represented earnings of a ship contractor deposited in special reserve funds under section 123(a)(7) of the Code, and section 607(h) of the Merchant Marine Act. Ultimate Finding of Fact The entire amount of the deposit, $2,074,028.43, was excludable from New States' gross income for 1959 as tax-deferred income. Basis Adjustments under Section 334(b)(2) New States purchased all of the capital stock of Old States on July 11, 1956, and liquidated and merged Old States into itself pursuant to Nevada law on June 30, 1957. The parties are agreed that this transaction came within section 334(b)(2), for the purpose of determining the basis of Old States' assets to New States' which provides that in certain circumstances, where the stock of a corporation is acquired by purchase and the assets of the corporation thereafter are distributed to the parent-owner of the stock in a nontaxable liquidation under *410 section 332, the basis of the property so distributed shall be derived from the basis of the stock interest in the subsidiary, with certain adjustments. The following assets were among those received by New States in the liquidation of Old States on June 30, 1957, and the parties are agreed that these assets are the equivalent of money, and therefore have a basis equal to value: Cash
$ 864,775.13
Accounts receivable
1,399,706.89
Shipping inventories
68,427.70
Spare parts
129,766.96
Prepaid and deferred items 719,347.66
$3,182,024.34 The remaining assets received by New States in the liquidation of Old States and their fair market values on June 30, 1957, were as follows: Assets Received in Liquidation of Old States
6/30/57 FMV
Vessels
4 VC2 AP3's
$4,800,000.00
2 C2's
2,500,000.00
Building (Vancouver, Wash.)
86,000.00
Assets Received in Liquidation of Old States
6/30/57 FMV
Land
55,000.00
Pac. Trans. Lines, Inc., stock
In issue
Portland Stevedoring Co. stock
615,555.00
Calif. Eastern Lines, Inc., stock
In issue
Furniture and fixtures
2,775.00
Automobiles 7,844.00 The parties are agreed that the following amounts *411 and adjustments were properly computed under the statute and regulations: (1) The original acquisition cost to New States of the capital stock of Old States, on July 11, 1956, was $11,108,843.43. This sum includes legal expenses of $58,843.43 incurred in connection with the purchase of that stock. (2) The basis of the Old States stock should be reduced in the amount of $300,000 for dividends paid to New States by Old States before Old States was liquidated on June 30, 1957. (3) The basis of the Old States stock to New States should be reduced by $3,182,024.34, which represents "money received". (4) The basis of the Old States stock to New States should be increased by $2,061,520.96, which is the sum representing "liabilities assumed or subject to which the property was received." This amount does not include the payment in 1959 for the S.S. Pennsylvania cargo loss claims. (5) The basis of the Old States stock should be increased by $744,943.86 for the interim earnings and profits of Old States for the period from July 11, 1956, to June 30, 1957. (6) The basis to New States for the stock of Old States should be reduced by $119.80 of the interim earnings and profits deficit *412 of Quaker Line, Inc., for the period from July 11, 1956, to June 30, 1957. (7) The basis to New States for the stock of Old States should be increased by $45,362.68 for the interim capital gains realized by Old States for the period from July 11, 1956, to June 30, 1957. Thus the parties are agreed that the basis of the Old States stock to New States, after all adjustments, is at least $10,478,526.79 as shown by the following schedule: Adjusted basis of Old States (subsidiary) stock held by New States (parent) - cash purchase 7/11/56 - 334(b)(2)
$11,108,843.43
Cash dividend distribution by Old States to New States between 7/11/56 and 6/30/57 - 1.334-1(c)(4)(ii)
$ 300,000.00
"Money" (i.e., cash, accts. receivable, inventories, etc.) re- ceived byNew States - 1.334-1(c)(4)(v)(b)(1)
3,182,024.34 159 Liabilities of Old States assumed by New States (excluding S.S. Penna. loss payments) - 1.334-1(c)(4)(v)(a)(1)
$ 2,061,520.96
Interim (7/11/56 to 6/30/57) earnings and profits of Old States - 1.334-1(c)(4)(v)(a)(2)
744,943.86
Interim (7/11/56 to 6/30/57) earnings and profits (Deficit of Quaker Line) - 1.334-1(c)(4)(v)(b)(2)
$ 119.80
Interim (7/11/56 to 6/30/57) capital gains realized by Old States - 1.334-1(c)(4)(vii)(a)
45,362.68
$3,482,144.14
$13,960,670.93 -3,482,144.14
$10,478,526.79
*413 Three questions remain in issue with respect to the determination of the basis, under section 334(b)(2), and the regulations, of assets received by New States in the liquidation and merger of Old States into New States, as follows: (1) The fair market value of 1,202 shares of California Eastern Lines stock, out of a total of 2,276, on June 30, 1957, the date New States received the 1,202 shares of stock in the liquidation and merger of Old States. (2) The fair market value of all of the stock of Pacific Transport Lines on June 30, 1957. (3) Whether the basis of Old States' stock in the hand of New States should be adjusted for the earnings and profits of Old States, and of its three subsidiaries, Pacific Transport Lines, Portland Stevedoring Co., and California Eastern Lines, for the interim period between the date of the acquisition of all of Old States' stock on July 11, 1956, and the date of the liquidation and merger of Old States on June 30, 1957; or whether the basis of Old States' stock in the hands of New States should be adjusted only for the interim earnings and profits realized by Old States. During the period July 11, 1956, to June 30, 1957, the subsidiaries *414 of Old States realized earnings and profits as follows: Subsidiaries
Earnings and Profits
Pacific Transport Lines
$1,772,148.01
Portland Stevedoring Co
126,303.49
California Eastern Lines 31,980.39
$1,930,431.89
Quaker Line, Inc (loss) (119.50)
Total
$1,930,312.39
Petitioners, in their schedules, have increased the adjusted basis of the Old States stock to New States by the aggregate amount of net earnings and profits of all of the subsidiaries. Respondent has disallowed the claimed adjustment for the interim earnings and profits of Pacific Transport Lines, Portland Stevedoring, and California Eastern Lines. Among the assets received by New States on June 30, 1957, were 1,202 shares of California Eastern Lines' stock. It is stipulated that on July 11, 1956, California Eastern Lines had 2,753 shares of its stock issued and outstanding, of which 1,202 shares were owned by Old States; that after July 11, 1956, California Eastern Lines offered to redeem its stock at $136.50 per share, except the shares owned by Old States; and that between June 18 and June 30, 1957, 477 shares were so redeemed, so that on June 30, 1957, Old States owned 1,202 shares *415 out of the total of 2,276 outstanding shares of California Eastern Lines. It is stipulated that on June 30, 1957, the assets of California Eastern Lines consisted only of cash, United States Government securities, and interest accrued thereon; and that California Eastern Lines' liabilities on that date, June 30, 1957, consisted solely of accrued Federal income taxes. It is also stipulated that on June 30, 1957, the fair market value of the assets of California Eastern Lines was $323,092. When New States received all of the stock of Pacific Transport Lines on June 30, 1957, Pacific Transport Lines was operating as a subsidized carrier under an operating-differential subsidy agreement with Marad. Included among the assets of Pacific Transport on June 30, 1957, were deposits with Marad of tax-deferred earnings, in the amount of $1,220,583.71. These funds could be withdrawn and used only with the permission of Marad, and any such withdrawals would be included in taxable income for the year of withdrawal, except to the extent they were used, with the approval of Marad, for the purchase of vessels for use in subsidized operations. Up to June 30, 1957, Pacific Transport Lines had made *416 withdrawals, with the approval of Marad, from its tax-deferred reserve accounts with Marad, in the 160 aggregate amount of $2,640,928.43, of which the sum of $2,420,294.35 continued to be tax deferred as of June 30, 1957, because it was invested in subsidized vessels. Assets of Pacific Transport Lines in the total amount of $3,640,878.25 (the total of $2,420,294.54 invested in subsidized vessels, and $1,220.583.71 on deposit in reserve accounts with Marad) represented earnings or income of the subsidized operator which had not been taxed as of June 30, 1957, and which was subject to a potential income tax liability on June 30, 1957. When Old States was liquidated and merged into New States on June 30, 1957, all of the assets of Old States were distributed or transferred to New States. Among the assets received by New States in the liquidation of Old States were the earnings and profits realized by Old States during the interim period between July 11, 1956, and June 30, 1957, (less the amount of any distribution therefrom made by Old States during that period). New States also received from Old States the stock of Pacific Transport Lines, Portland Stevedoring Co., and California *417 Eastern Lines which was held and owned by Old States as of June 30, 1957. The interim earnings and profits realized by Pacific Transport Lines, Portland Stevedoring Co., and California Eastern Lines during the interim period between July 11, 1956, and June 30, 1957, were not distributed to New States on June 30, 1957, when Old States was liquidated and merged into New States. Between the period July 11, 1956, and June 30, 1957, Pacific Transport Lines realized earnings and profits in the amount of $1,772,148.01. The fair market value as of June 30, 1957, of the stock of Pacific Transport Lines held by Old States on that date is in dispute. The fair market value as of July 11, 1956, of the stock of Pacific Transport Lines held by Old States is also in dispute. Portland Stevedoring Co. realized earnings and profits for the period July 11, 1956, to June 30, 1957, in the amount of $126,303.49. The fair market value of the stock of Portland Stevedoring Co., held by Old States on July 11, 1956, was $688,792; and the fair market value, as of June 30, 1957, of the Portland Stevedoring Co. stock held by Old States immediately prior to its liquidation and merger into New States, was $615,550. *418 California Eastern Lines realized earnings and profits for the period July 11, 1956, to June 30, 1957, in the amount of $31,980.39. On July 11, 1956, the 1,202 shares of California Eastern Lines stock, owned by Old States, had a fair market value of $145,948. The fair market value as of June 30, 1957, of the 1,202 shares of California Eastern Lines held and owned by Old States as of that date is in dispute. Ultimate Findings of Fact The basis of Old States' stock in the hands of New States should be adjusted only for the interim earnings and profits of Old States in the amount of $744,943.86, and it should not be adjusted for the interim earnings and profits of Pacific Transport Lines, Portland Stevedoring Co., and California Eastern Lines. The fair market value of the 1,202 shares of stock of California Eastern Lines was $170,631, as of June 30, 1957, when the stock was received by New States in the liquidation and merger of Old States and the transfer of Old States' assets to New States. The fair market value of the shares of stock of Pacific Transport Lines was $14,001,505 as of June 30, 1957, when the stock of Pacific Transport Lines was received by New States from Old *419 States. Opinion Most of the questions for decision involve New States, called States Line when it was organized. For the taxable period January 1 to September 9, 1957, New States was a parent corporation having four subsidiaries. A consolidated return was filed for the group. Prior to 1959, New States had become a subsidiary of Pacific Transport Company, and for the period September 10 to December 31, 1957, and for the calendar years 1958 and 1959, the affiliated group was Pacific Transport Company and four subsidiaries, including States Steamship Company, and consolidated returns were filed for those periods. The respondent determined income tax deficiencies for the three taxable periods, 1/1/57-9/9/57, New States, Docket No. 2825-65, $785,465.44; 1/1/57-9/9/57, Pacat, Docket No. 2824-65, $9,209.21; and for Pacific Transport Co., Docket No. 2823-65, 9/10/57-12/31/57, $52,253.01, and for 1958, $63,379.14. 161 The deficiencies for each of the taxable periods result in the larger part from respondent's determinations that for the year 1959, New States, a subsidiary of Pacific Transport, was not entitled to deductions totaling $1,431,267.78 and, therefore, New States did *420 not have any net operating loss. Those determinations, in turn, reduced the 1959 net operating loss of the affiliated group from the reported amount of $1,455,802.07 to $24,534.29. Therefore, the available operating loss for 1959 for carrybacks to earlier years was only $24,534.29, and respondent disallowed in whole or in part claimed deductions for loss carrybacks to 1957 and 1958. Other determinations which are in dispute have raised questions which are set forth hereinafter. After the 1959 consolidated return was filed, deductions were claimed by New States, Pacific Transport, and Pacat for loss carrybacks of the net operating loss of $1,455,802.07, as follows, which respondent disallowed in whole or in part: Petitioner
Taxable Period
1959 Loss Carryback
States S.S. Co.
Jan. 1 to Sept. 9, 1957
$1,276,460.94
Pac. Transport
Sept. 10 to Dec. 31, 1957
158,824.37
Pac. Transport
Jan. 1 to Dec. 31, 1958
48,964.48
Pacat
Jan. 1 to Sept. 9, 1957 20,516.76
Total
* $1,504,766.55
*421 The determination that New States did not have a net operating loss for 1959 results from his determinations that New States was not entitled to receive a deduction of $1,348,868.39 for its payment in 1959 of that amount to the owners of cargoes aboard the S.S. Pennsylvania when it was lost in a storm at sea; and that New States also was not entitled to receive a deduction for its deposit of $1,175,000 to its capital reserve fund held by the Maritime Administration, Marad, which was made under the Merchant Marine Act of 1936, except as adjusted so that there would not be any net operating loss. Most of the determinations of the respondent involving the 1959 net loss of New States totaling $1,431,267.78 are in issue unless his determinations were barred by the statute of limitations, excepting those now conceded by petitioners if the statute of limitations issue is decided for the respondent. Issue 1. Statute of Limitations The statutory notices of deficiencies in all of these cases were mailed on February 26, 1965. As of that date, the respondent could not make a determination of *422 a deficiency in the 1959 income tax liability of Pacific Transport and its subsidiaries because of the bar of the statute of limitations in section 6501(h), 1954 Code. On this point, the parties are in agreement. It is a fact, of course, that the respondent's determinations disallowing certain deductions taken on the 1959 consolidated return were not made for the purpose of determining that there was a deficiency in the income tax liability of the affiliated group for 1959, and that there remained a net operating loss of the affiliated group in the amount of $24,534.29 after the respondent's determination that New States, one member of the affiliated group, did not sustain a net operating loss in any amount and, also, did not realize any taxable income. The taxable periods in 1957, and the taxable year 1958, were open tax periods as of February 20, 1965, because the parties had executed timely consents extending the period of limitations. Therefore, the respondent was not barred from making the determinations of the tax deficiencies which resulted in the filing of the petitions in these cases. Among those determinations were the determinations that claimed deductions, for the taxable *423 periods involved here, for loss carrybacks from 1959 were not allowable either for the whole amount claimed, or for part thereof. The ground for those determinations was that the 1959 net operating loss was not more than $24,534.29, rather than $1,455,802.07. Petitioners contend that since 1959 was a barred or closed year, the respondent was barred from making recomputations of the amount of the income, or loss, for 1959, of any of the affiliated corporations whose income or loss was reported in the 1959 consolidated return, for the purpose of making determinations of the amount of any allowable net operating loss carrybacks from 1959. Petitioners cite Edward G. Leuthesser 162 18 T.C. 1112 (1952) in support of their contention. This Court's reasoning and conclusions in State Farming Co., 40 T.C. 774 (1963) are applicable here, and are dispositive of petitioners' contentions. It was held in State Farming Co. that the Commissioner could recompute the amount of a taxpayer's income or loss for a closed year where such computation was for the purpose of ascertaining *424 what amount, if any, of net operating loss of a closed year was available for carrying over or carrying back to an open taxable year. We pointed out in State Farming Co., supra, pp. 781-783, that "[recomputations] of barred years' income for determinations of net operating loss carrybacks have been upheld as proper", citing Phoenix Coal Co. v. Commissioner, 231 F. 2d 420 (C.A. 2), affirming a Memorandum Opinion of this Court, and Commissioner v. Van Bergh, 209 F. 2d 23 (C.A. 2). We stated, further, that this Court "may consider such facts of other years as may be necessary to a proper determination of a deficiency for an open year. * * * If petitioners had income in 1952, we may consider that fact in determining a deficiency for the open years of 1953 or 1955." In these cases, respondent's determinations with respect to the closed year 1959 were only for the purpose of ascertaining whether there was a net operating loss for 1959, and the amount thereof, which could be carried back to the open taxable periods, 1957 and 1958, so as to be deducted *425 from the income of those taxable periods. Under the reasoning of State Farming Co., supra, and the cases cited there, it is held that respondent was not barred by the statute of limitations from recomputing the amount of the 1959 net operating loss of Pacific Transport and its subsidiaries; and that he was not barred from making the determinations involving the deductions claimed by New States so as to ascertain the correct amount of the net operating loss of New States for 1959, if any. Consideration has been given to Edward G. Leuthesser, supra, cited by petitioners, and to petitioners' argument, but it must be concluded that Leuthesser, on its facts, is distinguishable from these cases. Issue 2: Payment by New States in 1959 of Judgment for Cargo Lost on S.S. Pennsylvania in 1952 In 1959, New States paid $1,445,394.22 in settlement of a judicially determined liability for cargo lost when the S.S. Pennsylvania sank in the Gulf of Alaska in 1952. The payment represented $1,348,868.39 in settlement of claims, and $96,525.83 interest to the date of payment. Upon reviewing the 1959 consolidated return, reporting a net operating loss for 1959, respondent concluded *426 that a deduction for interest in the above amount was allowable in determining whether New States realized income or sustained a net operating loss in 1959; but he concluded that $1,348,868.39 could not be treated as a loss, deductible in full from the income of New States for 1959, and that this amount represented a capital expense to be allocated among capital assets of New States. That conclusion, along with others in issue, resulted in the determination that New States did not sustain a net operating loss for 1959, and carrybacks of a claimed net operating loss were disallowed, contributing to the deficiencies for the taxable years. The ultimate question is whether the expenditure in 1959 represents a fully deductible loss for the purpose of computing the amount of New States' alleged net operating loss for 1959, if any, or was a capital expense to be included in the basis of certain assets of New States. If it is held that the expenditure was not a capital expense, there will not be another issue involving the allocation of such expense to and among certain assets. The S.S. Pennsylvania was an asset of and was operated by Old States in 1952. One aspect of the general issue *427 relates to New States' assumption of all of the liabilities of Old States as of June 30, 1957, when New States was in the process of acquiring the assets, and the liabilities, of Old States. It is respondent's position that the liability in excess of insurance paid by New States was a capital expenditure because it was a liability of Old States which arose in January, 1952, when the S.S. Pennsylvania sank while being operated by Old States. He asserts that the key fact is that the liability arose during the course of Old States' business operation, and, though it was not fixed and determined in amount in 1957, during Old States' corporate existence, was Old States' liability, even though a contingent one. He recognizes that $1,348,868.39 163 was an amount in excess of the amount which could or would be paid under Old States' insurance coverage of a liability for loss of cargo. Respondent argues that New States assumed all of the possible liability for cargo losses when it acquired the assets of Old States on June 30, 1957, even though a possible liability for an amount in excess of insurance was a contingent liability at that time, and that therefore the amount paid in 1959 constituted *428 part of the cost of acquiring Old States and therefore should be capitalized. He argues that it could not be a deductible expense in 1959 because it was not connected with New States' operating expenses since the alleged liability arose prior to New States' existence. Respondent argues that it makes no difference whether the liability for the cargo losses, as finally determined by judicial determinations, was an undetermined or unknown liability at the time New States acquired Old States' stock on July 11, 1956, or when it acquired the assets of Old States and assumed its liabilites on June 30, 1957. In other words, he takes the position that it makes no difference whether New States or its executives (particularly J.R. Dant took into account an amount or any amount for a contingent liability in determining the amount of their bid to Blyth for Old States' stock, which was accepted by Blyth. He contends that it makes no difference whether the purchaser of the stock of New States discounted or made any adjustment in the amount of the bid submitted, with respect to any amount for a contingent liability for cargo losses. He argues that the understanding or "intent" of the parties to *429 the sale is irrelevant in the determination here of whether the expenditure in 1959 was or was not a capital expenditure. He argues that if the final liability arose during the operations of the predecessor corporation, it is nevertheless part of the cost of New States' acquisition of Old States' assets no matter how contingent and speculative the particular liability of Old States was when that corporation and its assets were acquired by New States. Respondent relies principally upon Holdcroft Transportation Co. v. Commissioner, 153 F. 2d 323 (C.A. 8, 1946), affirming a Memorandum Opinion (1945) of this Court. Petitioners contend that the cargo loss liability and the amount thereof, in excess of the insurance coverage and beyond the limited liability of Old States under statutes, was so contingent and speculative at the time Old States' stock was purchased from Blyth that in fact it was not taken into consideration by the purchaser in the determination of the amount of its bid, and therefore cannot be regarded as part of cost. They argue that the decision of the District Court, which preceded the purchase of the Old States' stock, affirmatively held that there would *430 be no liability for the cargo losses in excess of applicable insurance coverage and therefore the management of the new corporation, New States, particularly J.R. Dant, believed that the dollar amount of the bid for Old States' stock need not be discounted or adjusted for the cargo claims, and that, in fact, the amount of the bid which was accepted by Blyth was not discounted for such liability. Petitioners argue that the amount of the liability, and the liability in excess of insurance, which was paid in 1959, nearly two years subsequent to the assumption of Old States' liabilities, was so speculative, contingent, and unexpected, that it should not be considered as part of the cost of acquiring Old States, but, instead, must be held to have been a deductible loss in 1959, when the liability was judicially and finally fixed both as to amount and as a legal obligation. Petitioners recognize that, in part, section 334(b)(2) of the Code governs the transactions of July 11, 1956, and June 30, 1957, in which Old States' assets were acquired and its liabilities assumed by the process of acquiring Old States' stock and subsequently acquiring its assets upon its liquidation. They point out *431 that section 334 (b)(2) deals with the basis of assets received by an acquiring corporation in transactions qualifying under that section and they argue that Holdcroft Transportation Co. v. Commissioner, supra, is distinguishable because it did not involve a situation governed by section 334(b)(2). Petitioners also argue that section 334(b)(2) (and its regulations) does not specifically provide that the basis of assets received in the liquidation of a subsidiary should be adjusted for contingent liabilities, and that if contingent liabilities are required to be added to the aggregate basis of the assets acquired, and then allocated to the assets received upon liquidation when that liability does subsequently accrue, upon becoming fixed and determined in amount, then tremendous accounting difficulties would result, such as recomputation of the bases of the assets received; recomputation of gain or loss on the sale or exchange of assets disposed of during the interim period 164 prior to the addition and allocation of the amount of the subsequently determined liability to bases of assets received; and the recalculation of allowable depreciation on depreciable or amortizable *432 assets received during the interim years. Petitioners have made an alternative argument: That the transaction involving the acquisition of Old States' assets and the assumption of its liabilities was a statutory merger under Nevada law, which was a qualified reorganization under section 368 (a)(1)(A); and that New States was entitled to carry over the loss deduction, which Old States would have been entitled to for the cargo loss liability if it had remained in existence until the time when the liability finally became fixed and determined in amount. They contend that section 381(a)(2) provides that where a transaction qualifies as a statutory merger under section 368(a)(1)(A), the acquiring corporation is entitled to carry over the items of the acquired corporation which are described in section 381(c). They argue that section 381 (c)(16) is applicable to the situation here and operates to allow New States a deduction for the contingent cargo loss liability which they contend did not accrue until after the acquisition, where, as is required in section 381(c)(16), there was no adjustment or discount in price for the contingent liability. [2] Respondent contests petitioners' reliance *433 on section 381(a)(2) and section 381(c)(16), pointing out that section 381 (a)(1) specifically prohibits the application of section 381(c) to transactions involving liquidations of subsidiaries where the bases of assets received are determined under section 334(b)(2), and he also points out that section 381(a)(2) allows that the items described in subsection (c) of section 381 can carry over only in reorganizations such as a section 368(a)(1)(A) reorganization, where section 361 applies. Respondent argues that section 361 (relating to the nonrecognition of gain or loss) applies where a corporation, a party to a reorganization, exchanges its property solely in exchange for stock or securities in another corporation, a party to the reorganization, and that, here, Old States exchanged its property in the liquidation of June 30, 1957, for its own stock, not the stock of another corporation. [3] Respondent argues, therefore, that New States does not qualify under either section 381(a)(1) or section 381(a)(2) for the application of section 381(c)(16). *434 Because the parties have discussed at great lengths petitioners' alternative argument described immediately above, it will be dealt with briefly, even though we feel 165 it is apparent that petitioners' argument is without merit. It has been stipulated that Old States was "liquidated and merged" into New States on June 30, 1957. And there is ample evidence in the record to the effect that the subsidiary, Old States (being a subsidiary since July 11, 1956, when New States purchased all of Old States' stock from Blyth) was merged into New States on June 30, 1957, pursuant to the Nevada merger statute, section 78.540 of the Nevada Revised Statutes, and the merger, therefore, was a statutory merger under Nevada law. Given the fact that this was a statutory merger under State law, and without deciding whether it was a statutory merger within the meaning of section 368(a)(1)(A), it is nevertheless clear that the transaction of June 30, 1957, was not a reorganization described in section 381(a)(2) which would allow the items described in section 381(c), and specifically section 381(c)(16), to carry over from Old States to the acquiring corporation, New States. *435 Section 381(a)(2) provides for the application of section 381(c) in various types of reorganizations (as described in section 368(a)) to which section 361 applies. Section 361 provides for nonrecognition of gain or loss to a corporation, a party to a reorganization, which transfers its property solely in exchange for the stock or securities of another corporation, a party to the reorganization. When Old States was merged into New States, pursuant to Nevada statute, its property was distributed to New States in exchange for its own stock (i.e., Old States' stock which New States had purchased) in the process of liquidation and dissolution of Old States. Old States did not receive the stock of another corporation. Upon the receipt of its own stock in exchange for its property, Old States' stock was canceled and the corporation was dissolved. It is apparent then that section 361 does not apply in this situation, and that the transaction resulting in the "liquidation and merger" of Old States does not qualify for carryover of the tax attributes *436 listed in section 381(c) from Old States to New States. In this regard, it is well to note that section 1.381(a)-1(b)(ii), Income Tax Regs., reiterates what is provided in section 381(a)(2) of the statute and specifically provides that a statutory merger qualifying for treatment under section 381 must be: (ii) A statutory merger or consolidation qualifying under section 368(a)(1)
(A) to which section 361 applies; And, as we have discussed above, section 361 does not apply to the transaction of June 30, 1957. Section 1.368-2(a), Income Tax Regs., also is enlightening with respect to the question of whether the transaction constituted a reorganization qualifying under section 381 (a)(2) so that the tax attributes of Old States, specifically those items referred to and described in section 381(c)(16), carry over to New States. Petitioners have argued that the transaction was a statutory merger under Nevada law and that it qualifies as a statutory merger within the meaning of section 368(a)(1)(A). In section 1.368-2(a) of the regulations, *437 with respect to the meaning of the term "reorganization" as used in section 368(a), the following is provided: §1.368-2. Definition of Terms. - (a) The application of the term "reorganization" is to be strictly limited to the specific transaction set forth in section 368(a). The term does not embrace the mere purchase by one corporation of the properties of another corporation, for it imparts a continuity of interest on the part of the transferor or its shareholders in the properties transferred. (Emphasis supplied.) The parties are agreed that the acquisition of Old States and the assumption of its liabilities is governed, in part, by the basis provisions of section 334(b)(2). Section 334(b)(2) is the codification in the 1954 Code of the holding of this Court in Kimbell-Diamond Milling Co., 14 T.C. 74 (1950), affirmed per curiam 187 F. 2d 718 (C.A. 5, 1951), cert. den. 342 U.S. 827, where it was concluded that where a corporation acquired stock of *438 another corporation with the purpose of liquidating that other corporation to acquire its assets, the transaction, in substance, constituted a purchase of the acquired corporation's assets, and, consequently, it was held that the basis of the assets so acquired was equivalent to the cost of acquiring the predecessor corporation's stock. [4] The Court 166 treated the essentially two-step transaction (consisting of (1) the purchase of the subsidiary's stock and (2) the acquisition of its assets and properties upon liquidation) as in substance and effect, an outright purchase of the acquired corporation's assets. *439 In the instant cases we view the purchase of Old States' stock on July 11, 1956, from Blyth, and its liquidation and distribution of its assets on June 30, 1957, events which the parties are agreed is controlled by section 334(b)(2), as essentially a purchase of Old States' assets. The two steps occurring July 11, 1956, and June 30, 1957, were in substance, one transaction constituting a purchase. See The South Bay Corporation v. Commissioner, 345 F. 2d 698 (C.A. 2, 1965), reversing in part sub nom. Utilities & Industries Corporation, 41 T.C. 888 (1964), Argus, Inc., 45 T.C. 63 (1965), and Kimbell-Diamond Milling Co., supra. In The South Bay Corporation v. Commissioner, supra, the Court of Appeals for the Second Circuit set forth a test for determining whether an acquisition of another corporation is a purchase or an acquisition in connection with a reorganization, when it stated the following, p. 703: When, as here, the transaction presents the determining elements of a change in ultimate ownership and an initial *440 purpose or intention to acquire assets rather than stock as such, each intermediate stage to the final end is not to be given the separate tax significance that belongs only to self complete business transactions, but the full transaction is to be weighed in its overall terms for its tax characterization. (Emphasis supplied.) Applying this test, it is clear that there was a change in ultimate ownership of Old States when New States acquired it from Blyth on July 11, 1956, and it is clear that there was an intent to acquire the assets case to the District Court; 259 F. 2d 463. rather than the stock of Old States, for the parties have stipulated and agreed that it was Mr. Dant's plan of acquisition that New States would dissolve Old States and acquire its assets within the two years after the purchase of Old States' stock contemplated by section 334(b)(2) of the Code. It is therefore concluded that the transaction was essentially a purchase of Old States' assets from Blyth, and that "each intermediate stage to this final end is not to be given separate tax significance." The liquidation and merger of Old States on June 30, 1957, was one of the two-step transaction which *441 is not to be regarded as of independent tax significance. Although there was a reorganization or merger within the framework of Nevada's statute, it will not be given recognition as a section 368 (a)(1)(A) reorganization for the purposes of qualifying under section 381(a)(2) for the carryover of Old States' contingent liability for cargo losses under section 381 (c)(16). The transaction was essentially a purchase and not a reorganization qualifying under section 381(a)(2), and our analysis of the question whether the cargo loss payment in 1959 was a capital expenditure or a deductible loss will proceed hereinafter on this basis. With respect to the purchase of Old States by New States, the question remains whether the sum paid in satisfaction of the contingent liability, which did not accrue 167 until almost two years after the acquisition process was completed with the "liquidation and merger" of Old States into New States on June 30, 1957, was a part of the cost of acquiring Old States, or whether it was a deductible loss of New States in 1959. After having given careful consideration *442 to all of the arguments of the parties, it is our judgment that the payment in the amount of $1,348,868.39 was a loss deductible by New States in 1959, rather than a capital expenditure. We cannot accept respondent's contention that if the liability arose out of the business operations of the acquired corporation, it is part of the cost of acquisition when subsequently paid, regardless of the purchaser's understanding or awareness of the contingent liability, and regardless of whether it is unknown or so speculative that the bid which is accepted, or the purchase price which is agreed upon by the vendor and vendee, is not discounted or adjusted on account of the liability. We cannot agree that an unexpected liability stemming from activities of an acquired corporation, which becomes fixed and determined in amount subsequent to the acquisition, is, as a matter of law, a capital expenditure even though the liability has not been taken into consideration by the parties to the sale in the determination of the consideration to be exchanged for the corporation acquired. In our opinion, *443 the understanding of the parties to the transaction, or, as it has been described on brief, their "intent" as to the purchase price is relevant to the question. See, for example, the case cited by petitioners, Eaton v. Commissioner, 81 F. 2d 331 (C.A. 9, 1936) affirmed 95 F. 2d 628 (C.A. 9, 1938). In Eaton, the determination of whether payments made by the taxpayer subsequent to the purchase of a farm were deductible losses or capital expenditures depended upon the intent of the taxpayer on the date of purchase. The question was whether the taxpayer at the time of purchasing the farm intended to destroy certain apple trees on the property acquired. If this were his intention on the date of acquisition, then the amounts were to be treated as a capital expenditure. If this was not his intention at that time, then the amounts expended were to be treated as deductible losses. Where there was no finding of this Court with respect to taxpayer's "intent" the Court of Appeals for the Ninth Circuit remanded the case, stating the following: It is apparent from a reading of these excerpts from the opinion of the *444 Board of Tax Appeals that it did not expressly find was was the intention of the taxpayer at the time he purchased the apple and pear orchard * * *. But, as stated by counsel, the question was the intention in the mind of the taxpayer at the time he made the purchase. There is no finding of fact upon this issue. See also United States v. Minneapolis St. Louis Railway Co. 260 F. 2d 663 (C.A. 8, 1958), where payments in settlement of a wage dispute by the acquiring corporation, though the payments represented wages of the railroad workers for a period of time that they were working for the predecessor-acquired corporation, were held to be a deductible expense and not part of the cost of acquisition. One of the facts considered by the District Court in making its determination was that there was not "the slightest indication that any settlement of the dispute was given consideration by the parties in arriving at the sales price." It is clear that the court there considered the intent or understanding of the parties with respect to what constituted the purchase price as relevant to the question of whether the payments made by the acquiring corporation are capital expenditures *445 or deductible expenses. Therefore, we feel it is relevant to the question of the nature of the cargo loss payments that they were not expected to accrue as a liability payable by New States out of its own corporate funds and that the purchase price of Old States was not discounted or adjusted to take into account the liability because it was not expected to result in a liability in excess of insurance. We think it should be noted that Minneapolis St. Louis Railway Co. also cast some doubt on respondent's fundamental premise that if expenditures are made by the successor corporation for expenses connected with the operations of the predecessor corporation, they must, of necessity, be an element of cost, because they are not operating expenses of the successor. In Minneapolis the successor paid for wages, retroactive to a date prior to the acquisition for work performed by railway workers during the course of the predecessor's business operations. Nevertheless, the costs, not arising out of the successor's business operations, were held to be deductible expenses, not capital expenditures. Other cases cited by respondent and petitioners have been considered, and it is our judgment *446 that they are not applicable 168 to the facts involved here. Holdcroft Transportation Co., supra, relied on extensively by respondent, is distinguishable because it dealt with an incorporation of a partnership in a tax-free transaction. In that case the basis of the partnership assets carried over to the enterprise in its corporate form. In addition, at the time of the incorporation it was quite evident that a monetary liability would be incurred by the successor corporation, a judgment, although not final, having been rendered against the partnership or its partners prior to the acquisition. Moreover, it does not appear that the tort liability was covered by insurance. In the instant cases we are not concerned with a tax-free incorporation or reorganization with a carryover of basis. As we have discussed above, we are dealing with a factual situation which is, in substance, a purchase of Old States' assets from Blyth. It was not a tax-free transaction, Blyth without question recognizing gain or loss on the sale of Old States' stock. The bases of Old States' assets do not carry over to New State, but rather new bases of the assets received are determined under section *447 334(b)(2), depending upon their cost, as adjusted for earnings and profits, and distributions of the acquired corporation during the interim period between the acquistion of its stock and the liquidation and distribution of its assets to the acquiring corporation. Moreover, in the instant cases, in contrast to Holdcroft, there was insurance which appeared, at the time of purchase, to adequately cover the potential liability, and there were favorable decisions which appeared to limit the liability for the cargo losses to less than the applicable insurance. Recognizing that we are dealing with a purchase involving essentially a two-step transaction, we think that the principles set forth by this Court in Albany Car Wheel Co., 40 T.C. 831 (1963), affirmed 333 F. 2d 653 (C.A. 2, 1964), are applicable here in regard to the question of whether contingent liabilities incurred or assumed in connection with the purchase of another corporation are capital expenditures or deductible expenses. Albany Car Wheel Co. involved the direct purchase of the operating assets of a predecessor company, and does not involve the application of section 334(b)(2). In these cases, *448 the assets were acquired by the indirect approach of acquiring the subsidiary's stock and liquidating it. Nevertheless, both cases involve essentially the purchase of the assets and for this reason we consider Albany's principles applicable here. In Albany Car Wheel Co., where the petitioner purchased its predecessor corporation's assets, the purchase price consisted of cash and the assumption of certain specified liabilities and obligations. In addition, with respect to an obligation of the predecessor-acquired company for vacation, holiday, and severance pay and pensions under a union collective bargaining agreement, the taxpayer, in making its offer to purchase the predecessor company, provided that it would negotiate an agreement with the union releasing the predecessor from obligations to its employees under the collective bargaining agreement. In the petitioners' offer to purchase, which was accepted, it was provided, in part, as follows, p. 834: * * * and the New Corporation shall deliver to the Company a document executed by the Union evidencing a full and complete release of any and all obligations to the Union or the members thereof, including any obligation with respect *449 to vacation, holiday, and severance pay and pensions, whether accrued or not. * * * In negotiating for the release, and in consideration for the release, the petitioner executed a new and different agreement with the union which made petitioner's obligations for severance pay contingent upon lack of sufficient advance notice to employees of the termination of work. It was petitioner's position that the contingent obligation for severance pay was part of the cost of acquiring the predecessor and that an amount for the contingent liability should be added to the bases of the assets acquired. With respect to whether an amount for the contingent liability for severance pay should be considered a part of the cost of acquiring the predecessor, this Court stated the following, pp. 839-841: The starting point in this case is section 1012 of the 1954 Code which provides that "The basis of property shall be the cost of such property * * * [except in certain situations not applicable here]." Accordingly, the decisive question before us is: What did petitioner pay for the assets that it acquired from the Old Co.? According to the stipulation of facts and the evidence before us, petitioner *450 paid $15,000 in cash on a note to the Old Co., and assumed certain specified liabilities of the Old Co. in the net amount of $74,360.35. The Commissioner insists that 169 the sum of these two figures, namely, $89,360.35, represents the "cost" of the assets purchased. Petitioner, on the other hand, claimed a cost of $137,543.95, 4 which was the book value of the assets in the hands of the Old Co. Petitioner undertook to support its higher cost basis by contending that, in addition to the foregoing $89,360.35 which it paid for the assets in the manner described, it also assumed an obligation of the Old Co. for severance pay to its employees under a union contract, that such obligation was equal to at least the difference between the $89,360.35 and the book value of the assets in the hands of the Old Co., and that it therefore represented an additional item cost for the assets which it thus acquired. We disagree. We hold that although petitioner did in fact procure the cancellation of the Old Co.'s contingent liability in respect of severance pay by executing a new and different type of contract with the union, petitioner's obligation under the new contract was of such contingent *451 character that it could not be considered part of the cost of the assets which it acquired, and that any such obligation which might actually result in a fixed liability in a later year may properly be taken into account in petitioner's behalf as a deduction in such later year. * * * Of course, there was always the possibility that petitioner might become liable for severance pay, if, for example, the plant should burn down and the employees were thrown out of work without having received the required notice. But petitioner protected itself against this contingency by insurance, and the premiums paid therefor were plainly deductible as a business expense. We think that petitioner's liability for severance pay, in view of the notice provisions, was so speculative that its obligations under the union contract cannot fairly be regarded as part of the "cost" of the assets acquired from the Old Co. * * * The same principles should be applied here. Here, as in Albany Car Wheel Co., the purchaser was protected against liability by insurance, and it appeared from court decisions prior to the purchase of Old States that any liability would be limited to an amount less than the amount of *452 applicable insurance. New States' obligation for the cargo losses was of such contingent character that it cannot be considered part of the cost of the assets which it acquired, and we think that when the obligation was determined and actually resulted in a liability of a fixed amount in a later year, it was properly taken into account by petitioners as a deduction of New States in such later year. Employing the language of Albany Car Wheel Co., we think that the liability for cargo losses was so speculative that it cannot fairly be regarded as part of the "cost" of the assets acquired. The proper focus under the facts of this case should be upon the unexpected nature of the liability which was determined to be in excess of applicable insurance, after the purchase, and only after the previous decision of the District Court (on February 16, 1956), affirmed on appeal by the Court of Appeals (on May 31, 1957), was modified by the same Court of Appeals (on November 15, 1957), and later clarified and reversed (on August 20, 1958). Petitioners have adequately demonstrated that the liability *453 in excess of insurance was not contemplated at the date Old States was purchased and that it was not taken into consideration in the calculation of the bid which was submitted to Blyth and accepted. In fact, on the basis of the decision of the District Court prior to the purchase of Old States' stock, there was the affirmative belief on the part of New States' management, particularly J.R. Dant, that no liability in excess of insurance would be incurred. Mr. Dant had weekly meetings with his attorney, Erskine Wood, with respect to the potential liability for the cargo claims. Mr. Wood advised J.R. Dant on several occasions prior to July 11, 1956, the date J.R. Dant effected the purchase of Old States by New States, that there was very little likelihood that the liability finally determined would exceed the applicable insurance. Mr. Wood advised Dant by letter of March 22, 1956, of the minimal chance that the liability would exceed insurance. And it would appear that the New States management believed that this possibility was even further reduced when on May 31, 1957, prior to the liquidation of Old States, the Court of Appeals affirmed the District Court's decision which the parties *454 have stipulated limited liability for the cargo losses to less than the insurance. The belief that no liability would be incurred in excess of insurance is shown by other events. The audit reports of Old States by independent accountants referred to it in footnotes as a possible liability amply covered by insurance. It was not disclosed to Blyth when Blyth acquired Old States from the Dant family on July 11, 1956. Blyth was advised by its attorney that this non-disclosure would justify Blyth's calling the deal off, but Blyth went ahead anyway. The corporate books of account for the years prior to the sale of Old 170 States' stock by Blyth to New States, made no provision for any loss from the cargo claims, and no reserve was set up on the books of account for such liability. No reference to the possible liability was made in the financial statements submitted to the bank when an $8,000,000 loan was obtained by New States (through the efforts of J.R. Dant), nor was reference made in the projections of earnings and financial position of New States submitted to the Maritime Administration in support of its application for an operating-differential subsidy contract. Therefore, it is *455 our finding that the parties were affirmatively convinced that there would be no liability and that they did not consider it in computing the bid which was submitted and accepted. When the liability was finally determined not to be limited by the Court of Appeals, on August 20, 1958, reversing the District Court's earlier decision limiting liability, it constituted an unexpected, unanticipated loss to New States. It is held that this unexpected liability for cargo losses, resulting in the payments in settlement of the liability in excess of insurance, was a deductible loss of New States when the liability was finally determined and fixed in 1959, after the Supreme Court denied certiorari and the petition for rehearing. In regard to section 334(b)(2) and section 1.334-1(c), Income Tax Regs., it should be noted that the parties have not pointed out any specific provision dealing with the treatment, with respect to basis, of contingent liabilities accruing after the liquidation of the subsidiary and the distribution of its assets to the acquiring corporation. *456 Indeed, careful consideration has been given to the provision of the statute and the regulations, but it does not appear that there is a provision dealing with situations involving unexpected, speculatively contingent, and subsequently determined liabilities such as was involved here. It is our determination that, under all of the facts and circumstances present here, the payments in settlement of the liability should not be added to the adjusted basis which is allocable to the respective asset received in the liquidation of the subsidiary. In this connection, it should be noted that petitioners' contentions about the exceedingly difficult and unworkable accounting problems, which would result if the expenditure in 1959 were held to be a capital expense, have substantial merit. We have carefully considered those contentions and have ascertained that, under the facts present here, the difficulties of allocation, recomputations of bases and allowable depreciation, and of gain or loss on sales of assets prior to 1959 are so enormous and complex as to render impractical calculations to follow from a capitalization of the expenditure in question. Moreover, in view of further reorganizations *457 prior to 1959, and sales of some of Old States' assets prior to 1959, New States could not recover a substantial amount of the proposed capitalization, taxwise. The principle that taxation is a practical concern of both the taxpayer and the Government, when applied to the facts here, militates in favor of petitioners and against respondent's assertions. Our conclusion, amply supported by the evidence, need not be delineated and further explained. To do so would necessitate and involve dealing with the alternative contentions of the parties about several ways of making, or attempting to make, retroactive allocations of the sum paid in 1959, in settlement of the judgment covering the cargo loss claims, to various assets acquired from Old States. In view of our finding and conclusion that the expenditure in 1959 of $1,348,868.39 was deductible in full, as a loss of New States, no real purpose would be served in describing and discussing the extreme difficulties of attempting to allocate that expenditure to and among assets, if the expenditure properly could be held to be a capital expenditure. Issue 3: Deposits by New States into Its Marad Reserve Accounts for 1959 For 1959, New *458 States paid into, or accrued for, its reserve-fund accounts with the Maritime Administration (Marad) the total sum of $3,487,612.73, of which $1,413,584.30 represented deposits of capital which, therefore, is not entitled to be treated as tax-deferred income, or as exclusions from gross income for 1959. (See p. 58, Findings of Fact.) The balance, $2,074,028.43, of the 1959 deposits to Marad reserve funds, is made up of three items of deposits totaling $899,028.43, and the deposit of $1,175,000 to the capital reserve fund with Marad (often called a "voluntary deposit" which, however, was a required deposit rather than a voluntary one). All of the deposits, totaling $2,074,028.43, were required under the operating-differential agreement between New States and 171 Marad, and they were as follows (see pp. 22, 45, 56, 57, 58, and 60 of the Findings of Fact): 1. Interest earned, reserve funds deposits
$32,563.14
2. Deposits from excess profits:
Prior years adjusts. $4,609.61 For 1959 587,092.36 591,701.97
4. For net depreciation 274,763.32 $899,028.43
3. Deposit to capital reserve fund 1,175,000.00
Total deposits
$2,074,028.43
The issue for determination *459 involves, in fact, the total amount of the above deposits, $2,074,028.43, rather than Item No. 3, above, the deposit to the capital reserve fund of $1,175,000, as is now explained, because respondent has failed in his arguments on brief to state his actual position clearly. Respondent, in his audit of the 1959 consolidated return and of the included statement of New States' 1959 gross income and "net taxable income", which was reported as a net operating loss, agreed that the deposits of $899,028.43 were entitled to be treated as "tax-deferred" income (which amount was reported in "deductions"). Respondent also agreed that the deposit of $1,175,000 to the capital reserve fund also represented tax-deferred income, but only in so far as that deposit did not contribute to the reported net operating loss for 1959 (see pp. 22, 23, 45, 46, 59, 60, and 61 of the Findings of Fact); and respondent focused his "adjustment" of the "deductions" for all of the Marad deposits on the deposit of $1,175,000 by disallowing $53,025.43 thereof as a "deduction" (but he allowed $1,121,974.57 thereof as a "deduction"). It has appeared in these cases that there is an "issue", or question, for decision relating *460 only to New States' deposit to its Marad capital reserve fund in the amount of $1,175,000, because in his audit of New States' statement of its 1959 gross income, deductions, and claimed net operating loss, the respondent disallowed as a "deduction" $53,025.43 of the claimed "deduction" of $1,175,000. Such narrowed question would be before us if all of respondent's determinations with respect to New States' claimed net operating loss for 1959 were to be sustained, because, as is set forth at length in the Findings of Fact (see pp. 21, 22, 23, 45, and 46), the net effect of all of respondent's determinations with respect to New States for 1959 was to conclude that New States did not have any net operating loss for 1959 to carry back to earlier years, and his disallowance of a deduction of $53,025.43, part of the Marad deposit of $1,175,000, brought into balance New States' income, $6,527,894.96, with the deductions "allowed" by respondent, $6,527,894.96. The deductions "allowed" by the respondent, totaling $6,527,894.96, included $1,121,974.57 of the Marad deposit of $1,175,000, so that respondent, in effect, recognized that the deposit, as such, did in fact represent tax-deferred income *461 to be excluded from taxable income under section 607(h) of the Merchant Marine Act, and under the Code's cross-reference thereto, section 123(a)(7), 1954 Code. It is within the above-described background that the parties have presented arguments about whether respondent properly treated part of the deposit of $1,175,000 as not being entitled to tax-deferred treatment; and it is in that posture that the parties have regarded an issue to be present for decision. However, it is our conclusion that such alleged issue is not a real issue but, rather, is a false, or at least a misconceived question, or in any event a question lacking in merit. For example: The respondent has not presented any argument relating to the tax-deferred, or not tax-deferred, status of all of the Marad deposits for 1959 totaling $2,074,028.43 in spite of the possibility that this Court might conclude that New States was entitled to deduct in 1959 as a loss the full amount paid in settlement of the cargo-loss claims, namely, $1,348,868.39. Having concluded that New States was entitled to a loss deduction for the full amount of the 1959 payment of the cargo-loss claims, we must now consider New States' claim that *462 all of its Marad deposits, $2,074,028.43, which includes the deposit of $1,175,000 in the capital reserve fund, represented tax-deferred income under section 607(h) of the Maritime Act, and under the applicable provisions of the 1954 Code, as well. Respondent "disallowed" New Stat deductions totaling $1,431,267.78, which included the payment of the cargo-loss claims. Without referring to our holdings under other issues (so as not to make our discussion even more detailed and complex), it is now evident that New States' "allowable" deductions for 1959 amounted to at least $6,527,894.96 (allowed by respondent), plus $1,348,868.39, or a total of $7,876,763.35, and that consequently New States had a net operating loss of at least $1,348,868.39. (See p. 46, Findings of Fact.) It is now evident, 172 also, that under this issue, and under respondent's general theory, we are called upon to decide whether New States' several types of deposits into Marad accounts (which totaled $2,074,028.43, p. 45, Findings of Fact) shall be treated as tax-deferred income to the extent of at least $1,348,868.39. Thus, we now are called upon to decide whether all of the deposit of $1,175,000 (not merely *463 $53,025.43 thereof), plus an additional $173,868.39 of all of the Marad deposits shall receive tax-deferral treatment. (See p. 45, Findings of Fact.) Perhaps the respective arguments of the parties can be regarded as extending to Marad deposits of $2,074,028.43, in principle, rather than only to $53,025.43 thereof. In any event, the respective arguments of the parties leave no other alternative, and we shall so consider the issue presented for decision. The general problem arises under section 607(h)[5] of the Merchant Marine Act of 1936, as amended. See 46 U.S.C.A. section 1177(h). See, also, section 123(a)(7), 1954 Code, [6] which is a cross-reference in the Internal Revenue Code of 1954 to section 607(h) of the Merchant Marine Act. Section 607(h) of the Merchant Marine Act provides, at first, that the deposited earnings of a subsidized contractor "shall be exempt from all Federal taxes", and, second, it provides that such deposited earnings shall be taxable when, and for the year, they are "withdrawn" from the "special reserve fund". *464 Section 123(a)(7) of the 1954 Code provides to the same effect by allowing "exemption" from income tax of "Earnings of ship contractors deposited in special reserve funds" held by the Maritime Administration. The closing agreement to which New States became a party in January 1958 (see pp. 53, 54, and 55 of the Findings of Fact), provided that all earnings, including capital gains (not tax exempt), which are deposited in the taxpayer's reserve funds held by Marad, shall be "tax-deferred income". The parties are agreed that the ultimate question under this issue is whether New States' Marad deposits (whatever the disputed amount thereof shall turn out to be) for 1959 are entitled to receive treatment as "tax-deferred income". *465 We turn now to particular facts about New States' business operations and the earnings therefrom in 1959, before discussing and setting forth the holding and conclusion under this issue. The business operations of New States included the operation of subsidized vessels and the services incident thereto, and unsubsidized operations. The regulations of the Maritime Administration, 46 C.F.R., section 286.4, make a distinction between the net earnings of the subsidized segment of the business and the overall corporate net income (or loss), and they set forth certain rules for making that distinction. For convenience, section 286.4 of the Marad regulations (included in petitioners' brief) is incorporated herein by reference. For example, section 286.4 of the Marad regulations sets forth the definition of "gross income" from subsidized operations; they provide for allocations between subsidized and unsubsidized activities; operating-differential subsidies shall be allocated *466 directly to subsidized operations; depreciation expense and other expenses shall be allocated between subsidized and unsubsidized operations; and interest income and dividend income shall be allocated between subsidized and unsubsidized operations. The application of the Marad regulations and the Marad accounting procedures to the operations of New States for 1959 resulted in Marad's determination that for 1959, New States had net earnings from its subsidized operations and funds allocable to its subsidized operations in a total sum which yielded net earnings from subsidized operations of $2,208,455.43, or $134,427 more than all of its Marad deposits for 1959 totaling $2,074,028.43. That is shown by the following schedule: 173 Net earnings (as defined in 46 C.F.R. 286.4) from subsidized operations
$2,523,481.23
Add back depreciation on vessels 1,685,650.87
Total funds available
$4,209,132.10
Marad deposits constituting capital (Exh. 59):
Depreciation - 1959
$1,410,887.55
Depreciation adjustments for prior years 2,696.75
1,413,584.30
Balance
$2,795,547.80
Excess profits recaputured by Marad 587,092.37
Balance
$2,208,455.43
Deposits of tax-deferred earnings (Exh. 59) 2,074,028.43
Excess of net earnings over deposits $134,427.00
*467 The above analysis, based on the evidence in the record, establishes that the aggregate amount of New States' Marad deposits for 1959, $2,074,028.43, was less than New States' net earnings from its subsidized business. Section 607(h) of the Merchant Marine Act deals with "earnings" of a subsidized contractor which are deposited in the contractor's Marad reserve funds. The evidence here esatblishes that all of the deposits of New States for 1959 in all of its Marad reserve funds, $2,074,028.43, were made out of New States' 1959 earnings from its subsidized business and operations. Moreover, the aggregate amount of the Marad deposits was less than New States' 1959 earnings from its subsidized business, as the above schedule shows. It is noted, and should be clearly understood, that the Marad deposits for 1959, made by New States, were made under and were required by several provisions of section 607 of the Maritime Act. The Marad deposits by New States fell into four categories; the explanation of each one is as follows: (1) Depreciation deposits were made in the total amount of $1,685,650.87, of which $274,763.32 was in excess of tax depreciation. This deposit, including the *468 deposit of $274,763.32, was made under section 607(b) of the Merchant Marine Act, which requires such a deposit to be made out of "gross earnings". Since the amount of the deposit did not exceed New States' gross earnings from subsidized operations for 1959, $7,101,759.69, it is fully excludable from taxable income. Mechanically, this result is achieved through the deduction as depreciation of an amount equal to the tax depreciation, and the exclusion as tax-deferred earnings of the excess of book depreciation over tax depreciation, namely, $274,763.32, part of the total sum of New States' deposits into Marad reserve funds. (2) Interest on the reserve funds in the amount of $32,563.14 was a "deposit" to a Marad reserve fund, which itself was left on deposit in the Marad accounts as is required by section 607(d)(2) of the Act. Paragraph IV of the closing agreement with the Commissioner of Internal Revenue (Exh. 31-AE) recognizes that this amount is tax-deferred. (3) New States' deposit of excess profits of $591,701.97 (which included a prior year adjustment of $4,609.61) was required by section 607(c) of the Act to be made from the "profits * * * earned by the business of the subsidized *469 vessels and services incident thereto." (4) New States' so-called "voluntary" deposit into its capital reserve fund of $1,175,000 was made under the authority and within the meaning of section 607(g) of the Merchant Marine Act (Exhs. 28-AB, 38-AL, 39-AM). However, the deposit of $1,175,000 was not a "voluntary" deposit in the sense that it could be freely made by New States. Before the deposit of $1,175,000 could be made to the capital reserve fund, the approval and the authorization of the deposit by Marad was required in accordance with the provisions of section 607(g). The deposit was authorized by Marad, by letter dated July 19, 1960, to be made only out of New States' subsidized free earnings (i.e., earnings from New States' subsidized operations, equivalent to 10 percent of the contractor's capital necessarily employed in its subsidized business), and the Marad letter authorizing and approving the deposit provided that in the event that the so-called "voluntary" deposit of $1,175,000 was in excess of the amount of the contractor's free earnings from subsidized operations for the calendar year 1959, the excess amount would be an offset against future mandatory deposits of New *470 States. An observation should be made about the deposit to the capital reserve fund of $1,175,000. Marad required as a condition to granting New States an operating-differential 174 subsidy contract that New States make annual deposits in the statutory reserve funds of mandatory deposits of excess profits and voluntary deposits of free earnings in amounts totaling not less than $1,200,000 per annum, on a cumulative basis for the eight year period 1958-1965, inclusive. On March 21, 1960, New States made a request for approval of a voluntary deposit posit in the capital reserve fund of free earnings from subsidized operations for the calendar year 1959, in accordance with the provisions and requirements incident to the subsidy contract, FMB-62. The request for approval of the voluntary deposit to the Marad capital reserve fund was to enable New States to have sufficient reserve funds to pay its part of the cost of four new Mariner-type vessels which New States and Marad had contracted to have constructed by the Newport News Shipbuilding & Dry Dock Co. The deposit of $1,175,000 to New States' capital reserve fund with Marad was approved and authorized by Marad by letter dated *471 July 19, 1963. New States had net earnings from subsidized operations in 1959 in the amount of $2,523,481.23. The subsized contractor had free earnings or net profit, an amount equivalent to 10 percent of capital necessarily employed in the business as that term is defined by regulations under section 607 of the Merchant Marine Act, in the amount of $1,349,296.50. New States was authorized to make the deposit of $1,175,000 out of these free earnings from subsidized operations, and the deposit was, in fact, made to the capital reserve fund out of the contractor's free subsidized earnings. The parties have argued on brief as to whether the deposit of $1,175,00/ was a mandatory deposit under section 607(b) of the Merchant Marine Act, or whether it was a voluntary deposit under section 607(g). While we find that the deposit was one made pursuant to section 607(g), we consider this fact not relevant to the issue because section 607(h) provides for the exemption from tax, or tax-deferral, of earnings from subsidized operations for all deposits made to the contractor's reserve funds in accordance *472 with section 607 of the Merchant Marine Act, and it does not make any distinction for tax purposes between deposits in reserve funds under section 607(b) and deposits under section 607(g). The deposit of $1,175,000 increased the contractor's capital reserve fund and helped finance the cost of four new Mariner-type vessels. Rather than being strictly voluntary, the deposit is more properly called a contractural deposit, which was required or necessitated in order to serve the purposes of the Merchant Marine Act, namely, to foster the development of a modern efficient merchant marine which is capable of carrying our domestic commerce and a substantial part of our foreign commerce, and capable of serving as a naval auxiliary in times of war or national emergency. In summary, the above explains the four deposits of New States for 1959 to Marad reserve funds, aggregating $2,074,028.43, all of which are in issue under petitioners' general contention that all of the deposits are entitled to receive tax-deferral treatment for 1959, so that they properly shall be excluded from New States' gross income, and hence its taxable income, for 1959: 1. Net depreciation on vessels
$274,763.32
2. 1959 interest accumulated in fund
32,563.14
3. Excess profits, 1959
591,701.97
4. Contractual deposit, capital reserve fund 1,175,000.00
$2,074,028.43
*473 The deposits for which petitioners claim tax-deferral treatment, all were made from the sources specified in section 607 of the Merchant Marine Act. The depreciation deposit of $274,763.32, in excess of tax depreciation, was made from "gross earnings" of the subsidized operations as is provided by section 607(b), since the gross earnings for 1959 from subsidized operations exceeded the total depreciation deposit by a considerable margin. The interest earned on the reserve funds, in the amount of $32,563.14, was itself left on deposit in the reserve accounts as is required by section 607(d)(2). The balance of the amounts deposited, for which petitioner claims tax-deferral treatment, consists of excess profits of $591,701.97 and the contractual deposit of $1,175,000, which respectively are required to be made from "profits * * * of the subsidized vessels and services", section 607(c), and from "net earnings of subsidized vessels and services incident thereto" available for distribution to stockholders (i.e., from "free earnings"), section 607(g). Since the total of these two deposits, and *474 the total of all of the deposits, is less than the amount of net profits from the subsidized operations, it 175 is apparent that they were made from the required sources and that, accordingly, they were made from "earnings" as specified in section 607(h) of the Merchant Marine Act, section 123(a)(7) of the 1954 Code, and paragraph II of the closing agreement with the Commissioner of Internal Revenue (Exh. 31-AE), set forth in the findings. As such, these amounts constitute tax-deferred income which is excluded from petitioner's gross income for tax purposes. (See the schedule, supra.) The following schedule, based on the evidence, shows New States' gross earnings from its subsidized business in 1959, $7,101,759.69; the exclusion from such gross earnings of the aggregate deposits of earnings from the subsidized operations, $2,074,028.43 (which includes net depreciation on subsidized vessels which petitioners treated as tax-deferred, $274,763.32); the other expenses of subsidized operations chargeable to gross earnings from subsidized operations; and New States' net earnings from subsidized operations, as defined by the Marad regulations, 46 C.F.R., section 286.4 *475 , in the amount of $2,523,481.23. The exclusion of the Marad deposits for 1959 (including depreciation of $274,763.32) resulted in taxable income of New States for 1959 from its subsidized operations in the amount of $137,123.75. For 1959 New States had a net loss from its unsubsidized operations in the amount of $1,568,391.53, which amounted to a net loss of $1,431,267.78, after applying the net gain of $137,123.75 from its subsidized operations. Gross earnings from subsidized operations, 1959
$7,101,759.69
Depreciation on subsidized vessels: Capital
$1,410,887.55 Tax-deferred 274,763.32 *
1,685,650.87
Balance
$5,416,108.82
Other expenses of subsidized operations 2,892,627.59
Net earnings as defined in 46 C.F.R. 286.4, taxable income
$2,523,481.23
Excess profits recaptured by Marad, being 50% of total excess profits 587,092.37
Balance
$1,936,388.86
Other Marad deposits *: Interest on reserve funds
$32,563.14 Excess profits - 1959
587,092.36 Excess profits adjustments
4,609.61 Contractual deposit 1,175,000.00
1,799,265.11
Taxable income from subsidized operations
$137,123.75
Net loss from unsubsidized operations (1,568,391.53)
Taxable income of New States (net loss) [1,431,267.78)
*476 Throughout the subsidy agreement involved here there are provisions dealing with the annual earnings of the operator, or contractor, from the subsidized operations and related services. The subsidy agreement contains provisions for determining what constitutes net earnings each year from the operation of the subsidized business, and Marad prescribed regulations in the subsidized business, and what constituted net earnings and profits therefrom. New States made all of its deposits to Marad reserve funds, for 1959, with the approval of Marad, out of its 1959 earnings from its subsidized business. All of the deposits of earnings gave rise to esclusions from the gross income from the subsidized operations. The closing agreement with the Commissioner does not require the existence of an overall corporate, net profit from the contractor's entire business, subsidized and unsubsidized, as a prerequisite to the tax-deferral of any and all of the contractor's Marad deposits. The closing agreement with the Commissioner, the subsidy agreement, section 607(h) of the Merchant Marine Act, and section 123(a)(7) of the 1954 Internal Revenue Code, all refer to "earnings" deposited *477 with Marad, without any distinction as to any particular subsection of section 607 which authorized or required a particular deposit. Furthermore, section 607(b) of the Merchant Marine Act provides that the contractor shall create and maintain out of gross earnings a "capital reserve fund". Thus, the concept of "gross earnings" exists under the Merchant Marine Act, and deposits "out of gross earnings" may be required. Respondent's theory that the tax-deferral of the amounts deposited in Marad reserve funds is dependent upon the existence of an overall corporate "net income" as opposed 176 to an overall corporate net loss from all of the contractor's operations (subsidized and unsubsidized) is contrary to the provisions of the statute (the Merchant Marine Act) under which the deposits for 1959 were required to be made, and were made. It is clear that under the Merchant Marine Act the Maritime Administration may require a contractor to make deposits out of the profits of the contractor's business covered by the subsidy contract. The clear implication is that the overall corporate business of the contractor will be segmented between its subsidized and its nonsubsidized business, *478 and that Marad deposits may be required if the subsidized business is operated at a net profit, regardless of whether the nonsubsidized business is operated in the same year at a loss. New States had net profits in 1959 from its subsidized business (the business covered by the subsidy agreement) in the amount of $2,523,481.33. Therefore, it could be, and was, required by Marad to make all of the Marad deposits involved here, even though the total amount of all of the Marad deposits exceeded its overall corporate net profit, from all of its business, for the year. Respondent's theory that contractual Marad deposits may not be excluded from income, and receive tax-deferral treatment, to the extent that there is an overall corporate loss is untenable and is without support. However, the above schedules establish that none of the Marad deposits for 1959, either separately or in the aggregate, created or caused the overall, net operating loss of New States for 1959, due to the fact that the aggregate amount of the deposits was less than New States' net earnings from its subsidized business. New States had a net operating loss for 1959, but that overall loss resulted from New States' other *479 operations which were wholly unrelated to its subsidized business, with respect to which every deposit to a Marad reserve fund was made. New States' losses from its other operations are deductible for tax purposes, standing upon their own facts and status. Respondent lacked authority at law, because of section 607(h) and other provisions of the Merchant Marine Act, to restrict and limit the statute-allowed, tax-deferral of all of the deposits made out of the earnings of the subsidized operations of New States in 1959 on the basis of New States' losses from its other, unsubsidized and general business operations. On the other hand, upon the evidence here and from the pertinent provisions of the Merchant Marine Act, it is evident that Marad did not exceed its jurisdiction in giving its consent to the deposits made by New States for 1959 into Marad reserve funds, and that all of those deposits were authorized by section 607 of the Merchant Marine Act. Since they were authorized by section 607, it follows that they were the deposits referred to in section 607(h), wherein the Congress has provided that such deposits "shall be exempt from all Federal taxes", i.e., tax-deferred deposits.
*480 Those deposits also were the deposits which are referred to in section 123(a)(7) of the 1954 Code, which refers to them as "exempt". Section 123(a)(7) is found in the part of the Code which is entitled "Items Specifically Excluded from Gross Income". For the purposes of this controversy, it does not matter whether the effect of these statutory sections is to exclude the Marad deposits from gross income or to "exempt" them, because in either event they are not part of gross income. Petitioners do not contend that the Marad deposits are permanently exempt instead of merely taxdeferred. What is involved here is that the Marad deposits are not part of gross income, by virtue of section 607(h) of the Merchant Marine Act, and that result must be recognized in spite of the result that a net operating loss carryback was produced. Respondent's adjustment with respect to the amount of the Marad deposits which can be excluded from gross income, and thus receive tax-deferral treatment for 1959, is not authorized by the Merchant Marine Act or by the closing agreement with him. His adjustment, and denial of tax-deferral treatment of the Marad deposits, represents his imposition of a limitation *481 upon section 607(h) of the Merchant Marine Act, but the limitation which he has attempted to impose is without any statutory authority. In Seas Shipping Co., 1 T.C. 30 (1942), this Court considered the issue in that case on the basis of both section 607 of the Merchant Marine Act and the pertinent provisions of the contract between the taxpayer and the Maritime Commission. We pointed out, p. 39, that there was no ambiguity in the language used by the Congress in section 607(h) of the Act, and that section 607(h) states that the earnings of any contractor receiving an operating-differential subsidy, which are deposited in the contractor's reserve funds, shall be exempt from all Federal taxes, meaning and 177 including income tax on the earnings in a taxable year which are deposited in the contractor's reserve funds. We said in Seas Shipping that section 607(h) is not to be narrowly construed, and that this is apparent from the fact that the Congress provided that an operator could deposit not only a percentage of its earnings but all of them, and that when they were deposited in a reserve fund, they were removed from the operator's general funds, and they could not *482 be used for the payment of income taxes, or any other taxes. The issue in Seas Shipping was a broader issue than is the problem in these cases. Nevertheless, Seas Shipping established this Court's general conclusion that section 607(h) is not to be narrowly construed, and that (p. 40) a subsidized taxpayer is not liable to income tax upon "any part of its earnings" deposited in Marad reserve funds. This general principle applies here under the particular facts of this issue. Of course, the year 1959, as such, is not before us, but respondent's theory has the effect of making some part of the earnings of New States for 1959, which were deposited in Marad reserve funds, subject to income tax, and that effect is the basis of the dispute here. Although the above observation appears to be obvious, it should be explained: In these cases respondent adopted a novel theory for which no precedent is cited, and none can be found. New States carried on an unsubsidized business in 1959, and it had general obligations which were unrelated to its subsidized business. Among them was its obligation *483 to pay a large sum to settle the claims resulting from the loss of the Pennsylvania in 1952, which had been operated by Old States. It has been stipulated that Old States was not a subsidized operator; therefore, the Pennsylvania was not a subsidized vessel. The payment in 1959 by New States of its judicially-determined obligation to pay the cargo loss claims was not an expense of New States' subsidized business in 1959, so that the payment of those claims was not a charge against the earnings of New States' subsidized business. Rather, the cargo loss payment was a general expense of New States which could be charged only against its unsubsidized business. Those payments contributed largely to the loss of New States from its unsubsidized business, and, consequently, to its net operating loss for 1959. What respondent actually has done here, under his novel theory, is to make a determination that New States' earnings from its subsidized business must be applied to offset and make up for New States' net operating loss from its general and unsubsidized business; and to achieve that result, respondent denied tax-deferral treatment to a part of New States' earnings from its subsidized business, *484 which part had been deposited in Marad reserve funds. Respondent employed a particular device in order to do this; he disallowed a "deduction" for as much of the Marad deposits of earnings as would offset and cancel New States' loss from its general and unsubsidized business, whatever the amount of that loss should happen to be as the result of this Court's decisions of other issues in these cases. If there had not been any loss from the general and unsubsidized business, respondent would have allowed all of the 1959 earnings from the subsidized business which were deposited in Marad reserve funds to receive tax-deferral treatment under section 607(h) of the Merchant Marine Act. But since there was a loss from the general and unsubsidized business, respondent has in effect determined that some, or even all, of the earnings deposited in the Marad reserve funds shall not receive tax-deferral treatment. There were not earnings of New States except from its subsidized operations. The net effect of respondent's theory and determination is to hold New States liable to income tax for 1959 upon all or part of the earnings which were deposited in Marad reserve funds. That is the real result *485 of respondent's theory, even though his "adjustments" in this case served to produce a zero figure rather than a figure for "taxable income". Respondent's novel theory was applied here to bring into balance all of New States' net income with all of its allowable deductions, but in order to obtain that balance, or zero figure, tax-deferral of deposit income has been denied, and that denial is tantamount to holding that certain tax-deferred earnings shall become subject to tax. Respondent's theory and adjustment with respect to a "deduction" of some amount, whatever it may be, for Marad deposits out of subsidized earnings is squarely contrary to the reasoning and holding in Seas Shipping Co., supra. Furthermore, his theory and adjustment here is clearly contrary to the provisions of section 607(h) of the Merchant Marine Act. Indeed, his adjustment represents a narrow construction of section 607(h) which cannot be approved. We said in Seas Shipping, p. 39, that the Merchant Marine Act was enacted by the Congress for the benefit of the United States, not 178 primarily for the benefit of the operator. We pointed out that the "statute makes ample provision to protect *486 the revenues." In these cases, our conclusion is that the respondent has exceeded his authority in making the adjustment and determination in issue here, and that his adjustment is not supported by any provision in the Merchant Marine Act, an act of Congress with which he is obliged to comply. Respondent has attempted to justify his adjustment by contending that the definition of taxable income in the 1954 Code provides a basis for the adjustment he has made, which is in conflict with section 607(h) of the Merchant Marine Act. His argument has been carefully considered, but it is only an exercise in semantics, and is without merit. No useful purpose would be served in discussing his contentions. It is concluded and held that under section 607(h) of the Merchant Marine Act, all of New States' deposits of earnings to the Marad reserve funds, $2,074,028.43, are earnings which are exempt from Federal income tax for 1959, as tax-deferred earnings, and that no part of those deposits are to be denied tax-deferral treatment in any respect. Respondent's theory, adjustment, and determination are rejected. Consideration has been given, of course, to the closing agreement with the Commissioner *487 of Internal Revenue, but there is nothing in that agreement which requires a different holding and conclusion under this issue. The closing agreement did not, and could not, have the effect of modifying a statute, 607(h) of the Merchant Marine Act. Rather, the closing agreement made it clear that upon taking all of the provisions of section 607(h) of the Merchant Marine Act into account, it means that earnings which are "exempt" from one year's tax may be regarded as entitled to receive "tax-deferral" treatment. Respondent also contends that allowance of the "deduction" for Marad deposits would give New States a double tax benefit. We do not agree. There is only one tax benefit resulting from the exclusion of Marad deposits f from New States' gross income for 1959. Assuming that the exclusion in 1959 contributes to the net operating loss, which can be carried back and applied against the income of an earlier year, a tax benefit occurs only with respect to the year to which the loss is carried back. Furthermore, since the exclusion of Marad deposits from gross income represents only tax-deferral, the excluded income will become subject to income tax in the year, or years, in which *488 it is withdrawn by New States from a reserve fund. No double tax benefit results from the exclusion of Marad deposits from New States' gross income for 1959. There is no merit in this contention of the respondent. The cases cited by respondent under this issue have been considered but they are not in point and they do not merit discussion. It is evident that the exclusion of Marad deposits from gross income has no greater effect than any other exclusion or deduction which goes into the computation of a net operating loss carryback. Thus for the year 1959, New States has a net loss. It gets no tax benefit from this net loss in its tax return unless it is entitled to carry the loss either backward or forward. Unless a minus balance is produced which can be carried backward or forward, the net effect of any deduction producing a minus figure is that so much of the deduction as produces a result less than zero is lost. No tax benefit is obtained from it. When respondent takes the position that the Marad deposits must be disallowed to the extent necessary to produce a net income of zero, respondent is simply denying a tax benefit to that much of the deposit. Our conclusion permits a *489 tax benefit to be given to the "deduction" for Marad deposits in the form of a loss carryback which later will balance the tax on any later withdrawal. Under section 172, defining loss carrybacks, the loss carryback is exhausted as it is applied to taxable income. To the extent that it is not used up in 1957, it is available to be applied against income of 1958. In this way, the "deduction" for Marad deposits is given a single tax effect. Nothing happens to the net operating loss carryback to revitalize it after it has been exhausted against the income of 1957 and 1958. Having become a zero figure through utilization against the income of 1957 and 1958, it is gone. It is not revitalized or recreated to be carried forward against the income of 1960, 1961, and 1962. Only if that could occur, would there be any basis for a suggestion that petitioners will obtain a double deduction. Issue 4: Basis Adjustments under section 334(b)(2) Under this issue there are questions requiring the determination of the basis of various assets acquired by New States from 179 Old States, when New States *490 caused the liquidation of Old States and the distribution of all of Old States' assets to itself on June 30, 1957. The parties have stipulated that New States' acquisition of Old States' stock on July 11, 1956, and the liquidation and distribution of Old States' assets on June 30, 1957, was governed by the provisions of section 334(b)(2) of the 1954 Code. They have stipulated also that the basis of the assets received are to be determined in accordance with the provisions of section 334(b)(2). [7]
Section 334(b)(2) provides in general that the basis of the property of the acquired corporation, in the hands of the acquiring corporation, shall be the acquiring corporation's adjusted basis in the stock with respect to which the distribution was made. The applicable regulation under section 334(b)(2) is section 1.334-1(c)(4), Income Tax Regs. It provides for adjustments to the basis of the stock of the acquired corporation, in the hands of the acquiring corporation, and for the allocation of the adjusted basis to the acquired assets, in proportion to the net fair market value of the acquired assets as of the date of the liquidation. *491 The pertinent parts of section 1.334-1(c)(4) of the regulations are set forth in the margin. [8]Section 1.334-1 (c)(4)(viii) provides that the "net fair market value" of an asset is the fair market value less any specific mortgage or pledge to which it is subject. *492 The problems involved under this issue relate to respondent's disallowance of depreciation deductions claimed for depreciation on assets received by New States in the liquidation of Old States, and they relate to respondent's inclusion of additional amounts in New States' income in the taxable year of the consolidated group, New States and its subsidiaries, ended September 9, 1957, for gains from the sale of capital assets which were received in the liquidation of Old States on June 30, 1957. The disallowed depreciation deductions claimed for the consolidated groups are in the amounts and for the taxable periods as follows: Group
Taxable Period
Depreciation Disallowed
New States and Subsidiaries
7/ 1/57- 9/ 9/57
$21,713.05 *
Pacific Transport Company and Subsidiaries
9/10/57-12/31/57
20,623.72
Pacific Transport Company and Subsidiaries
1/ 1/58-12/31/58
67,429.64
Pacific Transport Company and Subsidiaries
1/ 1/59-12/31/59
24,411.10
*493 180 The parties have stipulated that the disagreement over these depreciation adjustments stems entirely from the dispute over the basis adjustments required by section 334(b)(2). The parties have also stipulated that respondent's adjustment increasing the amount of capital gain to be recognized by New States in its taxable year ended September 9, 1957, from the sale of certain assets acquired in the liquidation of Old States stems entirely from their dispute over the basis adjustments required by section 334 (b)(2). The capital assets sold by New States in its taxable year ended September 9, 1957, which had been received in the liquidation of Old States, included two vessels, the S.S. Oregon and the S.S. Utah, and land and a building located in Vancouver, Canada. As the result of respondent's adjustments to the basis of these assets, respondent has included an additional $289,517.28 in New States' income in its year ended September 9, 1957, as recognized gain from the sale of capital assets. The assets received by New States from its liquidated subsidiary, set forth previously in the Findings of Fact, included cash, accounts receivable, shipping inventories, spare parts, *494 prepaid and deferred items, six vessels (including the S.S. Oregon and the S.S. Utah), the building and land in Vancouver, furniture and fixtures, automobiles, all of the shares of stock of Pacific Transport Lines and of Portland Stevedoring, and 1,202 (52.81 percent) of the outstanding shares of stock of California Eastern Line. Some of these assets were depreciable assets, the principal ones consisting of the vessels and the building in Vancouver. Other assets were nondepreciable. For the purposes of the questions for decision, the principal nondepreciable assets acquired were the shares of stock in the subsidiaries of Old States (Pacific Transport Lines, Portland Stevedoring, and California Eastern Line) which became subsidiaries of New States on the date of liquidation. Section 1.334-1(c)(4)(viii) provides that the parent's adjusted basis in the stock of the subsidiary is to be allocated to the assets received (whether or not depreciable or amortizable) in proportion to their net fair market value. Respondent and petitioners disagree on the fair market value of certain assets received *495 by New States in the liquidation of its subsidiary on June 30, 1957, and they also disagree on the total adjusted basis of the stock of Old States, in the hands of New States, which is to be allocated to the various assets. The specific questions in issue will be described hereinafter. However, the point to be made here is that the parties' disagreement over the adjusted basis of the subsidiary's stock in the hands of the parent and of the net fair market value of certain assets directly affects the amount of New States' basis in its depreciable assets received, as well as the basis of other assets received in the liquidation, which were subsequently sold, and upon which gain or loss was recognized. A higher basis in the depreciable assets and other capital assets which were sold by New States in 1957 affects both allowable depreciation and recognizable gain from the sale of the capital assets. To the extent that New States has a higher adjusted basis in the subsidiary's stock with respect to which 181 the liquidating distribution is made, and which is allocated to the assets received under section 334(b)(2), the corporationg will have a higher basis in its depreciable assets and *496 in its other capital assets which were sold. Consequently, it would have greater allowable depreciation on depreciable assets and less recognizable gain upon the assets sold. Also, to the extent that the depreciable assets and the capital assets sold have a higher fair market value relative to the other assets received, they will take a greater proportion of New States' adjusted basis in the subsidiary's stock which is allocated to the assets acquired and will result in greater allowable deductions on the depreciable assets received in the liquidation of the subsidiary, and less recognizable gain on the capital assets received in the liquidation which were sold by New States in its taxable year ended September 9, 1957. In these cases, respondent's adjustments disallowing certain depreciation deductions on depreciable assets and increasing the amounts of gain to be recognized from New States' sales of certain capital assets stem from (1) his disallowance of additions to New States' adjusted basis in Old States' stock for the earnings and profits of three of four subsidiaries of Old States, each of whose stock New States acquired in whole or in part, in the liquidation of Old States, *497 and (2) his determination of higher fair market values of certain nondepreciable assets acquired by New States, than the fair market values claimed by petitioners, which took a greater proportionate amount of the adjusted basis of the subsidiary's stock allocated among the assets received and consequently resulted in a lower basis to New States for the depreciable assets and other capital assets acquired. The basis of each of the assets acquired by New States in the liquidation and merger of Old States is affected by the three questions for decision under this issue which are as follows: (1) Whether the basis of Old States' stock in the hands of New States should be adjusted, as of June 30, 1957, for the interim earnings and profits or deficits of Old States and three of its four subsidiary corporations, or whether the basis of the stock should be adjusted only for the interim earnings and profits of Old States. All of the stock of Old States was purchased by New States (then States Line) on July 11, 1956. Between July 11, 1956, and June 30, 1957, the date of the liquidation of the subsidiary, Old States and its four subsidiaries, Pacific Transport Lines, Portland Stevedoring Co. *498 , California Eastern Lines, and Quaker Line, Inc., all had either earnings and profits or a loss. The parties are agreed that pursuant to section 1.334-1(c)(4)(v)(a)(2), Income Tax Regs., the interim earnings and profits of Old States should be added to the basis of Old States' stock in the hands of New States as of June 30, 1957. Also an adjustment for the loss incurred by Quaker Line is not in dispute. However, respondent does not agree with petitioners' contention that the basis of Old States' stock in the hands of New States should be increased by the amount of the interim earnings and profits of the other three subsidiaries of Old States. (2) Whether the net fair market value on June 30, 1957, of 1,202 shares of stock of California Eastern Lines is $170,631, as contended by petitioners, or $176,491, as contended by respondent. California Eastern Lines was a subsidiary of Old States on June 30, 1957, and became a subsidiary of New States in the process of liquidation. (3) Whether the net fair market value on June 30, 1957, of the shares of stock of Pacific Transport Lines is $12,097,998, as contended by petitioners, or $14,001,505, as contended by *499 respondent. The parties have stipulated that the net fair market value of Pacific Transport Lines cannot exceed a maximum of $14,001,505 and cannot be less than a minimum of $12,097,998. The specific question involved with respect to this issue is whether the value of the stock of Pacific Transport Lines as of June 30, 1957, held by New States, should be discounted for so-called deferred tax liability for earnings on deposit in reserve funds with Marad or invested in subsidized vessels. Adjustments to New States' Basis for Stock of Old States: First, with respect to the question of whether or not New States' basis in the stock of Old States should be adjusted, as of June 30, 1957, for the interim earnings and profits or deficits of the three subsidiaries of Old States, remaining in existence as of June 30, 1957, whose shares of stock New States acquired in the liquidation and merger: When New States purchased the stock of Old States on July 11, 1956, Old States owned all of the outstanding shares of stock of Pacific Transport Lines, Inc., Portland Stevedoring Company, and a substantial part of the stock of California Eastern Lines, Inc. Old States also owned all of the stock of Quaker *500 Line. Quaker Line was dissolved on June 12, 1957, and its shares of stock, all of which were 182 held solely by Old States, were retired. New States did not acquire any shares of stock in Quaker Line when Old States was liquidated and merged into the parent on June 30, 1957. Old States and the four corporations which were subsidiaries of Old States when its stock was purchased by New States on July 11, 1956, reported earnings and profits or a loss for the period from July 11, 1956, through June 30, 1957, or for Quaker Line from July 11, 1956, to June 12, 1957, as follows: Old States
$ 744,943.86
Pacific Transport Lines, Inc.
1,772,148.01
Portland Stevedoring Company
126,303.49
California Eastern Lines, Inc.
31,980.39
Quaker Line, Inc.
(119.80)
The parties are agreed that the basis of Old States' stock held by New States should be increased by the amount of the interim earnings and profits of Old States in the amount of $744,943.86. This adjustment is required by section 1.334-1(c)(4)(v)(a)(2) of the regulations, which provides that the adjusted basis of the *501 subsidiary's stock held by the parent shall be increased by subsidiary's earnings and profits (less any distributions therefrom) of the period between the date of purchase and the date of the last distribution in liquidation. Petitioners contend that this regulation also authorizes an adjustment to the stock basis for the interim earnings and profits of Old States' subsidiaries as well as the interim earnings and profits of Old States. Respondent has "allowed" an adjustment to the basis of Old States' stock held by New States for the earnings deficit of Quaker Line for the interim period July 11, 1956, to June 30, 1957, because of the small amount involved. However, it is respondent's position that the language of section 1.334-1(c) (4)(v)(a)(2) of the regulations allows an adjustment only for the interim earnings and profits of Old States, and not for the interim earnings and profits of Old States' subsidiaries which respondent calls "third tier subsidiaries". According to respondent the word "subsidiary's" in the regulation is singular and refers in that context to Old States. Respondent contends that no reference is made to subsidiaries or subsidiaries of the subsidiary and *502 that logic and ordinary grammatical construction prevent the extension of the meaning of this word to include the subsidiaries of Old States. Petitioners contend that the transaction should be treated as a direct purchase of the Old States assets. They argue that any earnings and profits of the subsidiaries of Old States will increase the value of the stock of these subsidiaries; and they argue that since this stock was among the assets of Old States, the interim earnings of those subsidiaries increase the value of these "assets" (the stock) held by Old States and should, accordingly, be included in any adjustment to the basis of the Old States stock held by New States. This, petitioners urge, is in line with the purpose of section 334(b)(2). After careful consideration of this question, it is concluded that New States' basis in the stock of Old States should not be adjusted under section 334(b)(2) for the earnings and profits for the interim period from July 11, 1956, to June 30, 1957, of Old States' three subsidiaries, Pacific Transport Lines, Portland Stevedoring Co., and California Eastern Lines. When Old States was liquidated on June 30, 1957, and its assets distributed *503 to New States, New States received part of the earnings and profits of Old States for the interim period. For the period July 11, 1956, through June 30, 1957, Old States had earnings and profits in the amount of $744,943.86, and Old States made distributions to New States during this interim period of dividends in the amount of $300,000. The parties are agreed that there should be an upward adjustment in New States' basis of Old States' stock for the earnings and profits of Old States and a downward adjustment in basis for the dividends paid during the interim period. These adjustments are provided for under section 1.334-1(c)(4)(v)(a) (2), Income Tax Regs. If New States' adjusted basis of its Old States stock were allocated to the assets received by New States in accordance with their net fair market value, without adjustment for the interim earnings and profits of Old States, then a portion of the adjusted basis of the stock would be allocated to the tangible assets representing the interim earnings and profits, less distributions, of $444,943.86, the amount of the adjusted basis of Old States' stock remaining for allocation to the other assets received *504 in the liquidation would be reduced. In such case, the basis of each of the individual assets received in the liquidation would be distorted from the basis that each of the assets would have received, if there had been a direct purchase of the assets on July 11, 1956, or a purchase of Old States' stock and a liquidation of the company on July 11, 1956. In order to prevent this 183 distortion in basis, the regulations provide that the basis of subsidiary's stock (Old States) in the hands of the parent corporation (New States) shall be increased by the amount of the subsidiary's interim earnings and profits during the interim period, less any distributions from earnings and profits during this period. The interim earnings and profits ordinarily are in the form of cash or its equivalent, and pursuant to section 1.334-1 (c)(4)(v)(b)(1) of the regulations, the parent's adjusted basis in the subsidiary's stock is reduced by the amount of "any cash and its equivalent received" in the liquidation. Therefore, the adjusted basis is increased by the amount of interim earnings and profits realized *505 by the subsidiary for the interim period, and the amount of the increase in the adjusted basis is allocated to the interim earnings and profits, which is usually in the form of money or its equivalent, and, consequently, the basis of the other assets received in the liquidation is not distorted. However, the earnings and profits of the subsidiaries of Old States do not have the same operative effect as the earnings and profits of Old States on the date of the subsidiary's liquidation. When Old States was liquidated, its earnings and profits less distributions in the amount of $444,943.86 were received by New States presumably in the form of cash or its equivalent. Therefore, the adjusted basis of Old States' stock, increased by the amount of interim earnings and profits, less distributions from earnings and profits, is allocated to the interim earnings and profits of Old States received by New States in the form of any cash or its equivalent on the date of liquidation. In contrast to the interim earnings and profits of Old States which were received directly by New States in the form of money or its equivalent, the earnings and profits of the subsidiaries of Old States for the *506 interim period July 11, 1956, to June 30, 1957, were not received directly by New States. New States received the stock of the subsidiaries of Old States, Pacific Transport Lines, Portland Stevedoring Co., and California Eastern Lines. New States did not receive the earnings and profits of these subsidiaries in the form of cash or its equivalent. And the basis of Old States' stock was not decreased pursuant to section 1.334-1(c)(4)(v)(b)(2) of the regulations, for "cash and its equivalent received" by New States, for the earnings and profits of these subsidiaries, because New States did not receive the interim earnings and profits of these subsidiaries upon the liquidation of Old States. Therefore, there was no distortion of the allocated basis of the individual assets received by New States as the result of the interim earnings and profits of Old States' subsidiaries, Pacific Transport Lines, Portland Stevedoring Co., and California Eastern Lines, because they did not operate to reduce the amount of the adjusted basis of Old States' stock by requiring an allocation of a portion of New States' adjusted basis in Old States' stock equivalent to "any cash and its equivalent received". *507 Petitioners appear to recognize this result but they argue that the interim earnings and profits increased the fair market value of each of the subsidiaries of Old States by amounts equivalent to the respective interim earnings and profits of each of the three subsidiaries. Petitioners contend that the alleged corresponding increase in the fair market value of each of the three subsidiaries, resulting from the respective interim earnings and profits, distorts the allocated basis of the assets received by New States in the liquidating distribution of Old States' assets. They contend that because the allocation of New States' adjusted basis is made in proportion to the respective net fair market values, as of the date of distribution, of the assets received, the increase in the net fair market values of the stock of the subsidiaries caused by the interim earnings and profits, causes more of New States' adjusted basis in Old States' stock to be allocated to the stock of the subsidiaries of Old States received by New States, and less of the adjusted basis in Old States' stock to be allocated to other assets of Old States received by New States in the liquidation. We cannot agree with *508 petitioners. Petitioners' argument fails in its premise that the change in the fair market value of the stock of the subsidiaries corresponds directly with the interim earnings and profits of the subsidiaries accruing during the period between July 11, 1956, and June 30, 1957. In fact, in the present case, there is no correlation between the fair market values of the three Old States subsidiaries and their earnings and profits. The lack of correlation between the change in fair market value of Portland Stevedoring Co. between July 11, 1956, and June 30, 1957, and the earnings and profits of that subsidiary for that interim period, is, perhaps, the best example of petitioners' error. Portland Stevedoring Co. had interim earnings and profits in the amount of $126,303.49. On July 11, 184 1956, Portland Stevedoring Co.'s fair market value was $688,792, and on June 30, 1957, the fair market value of that corporation was $615,550. The fair market value of Portland Stevedoring Co. decreased in the amount of $73,242 during the interim period, even though there were earnings and profits in the positive amount of $126,303.49. It is obvious, therefore, that there is no direct correlation *509 between the fair market value of the stock of Portland Stevedoring Co., and the earnings and profits of that subsidiary realized during the interim period, July 11, 1956, to June 30, 1957. Also, with respect to the fair market value of Pacific Transport Lines and California Eastern Lines, there is no direct correlation between the earnings and profits and the fair market value of the stock of these corporations. There is no provision in either the Code or the regulations for adjustment to basis for changes in the fair market value of subsidiaries of the subsidiary being liquidated (i.e., Old States) during the interim period between the purchase of the subsidiary's stock (Old States' stock) and the liquidation. In fact, section 1.334-1(c)(vi)(c)(1) provides that transactions involving a corporation the affairs of which the subsidiary controls at any time during the interim period may be disregarded in whole or in part. It is concluded, therefore, that no adjustment to New States' basis in the stock of Old States should be made for the interim earnings and profits of Pacific Transport Lines, *510 Portland Stevedoring Co., and California Eastern Lines. Petitioners have presented no cases or authority in support of their contention that the interim earnings and profits of the three subsidiaries should be added to New States' adjusted basis in the stock of Old States, and their position with respect to this question cannot be sustained. Fair Market Value of California Eastern Lines Stock, June 30, 1957: The second question relates to the net fair market value of the 1,202 shares of stock of California Eastern Lines on June 30, 1957, which were received by New States in the liquidation of Old States. The parties have stipulated that the assets of California Eastern Lines on June 30, 1957, consisted only of cash and United States Government securities. As of this date, the fair market value of these assets, including interest, was $323,092. It was further stipulated that on June 30, 1957, Old States owned 1,202 shares of the total 2,276 outstanding shares, or 52.81 percent of the California Eastern Lines' stock, with a total value of $323,092, was $170,631. Respondent argues that the net fair market value of a corporation is not necessarily equivalent to the value of its underlying *511 assets, in contesting petitioners' method of determining the value of the stock of the corporation. However, respondent does not give any reason or explanation for his determination of the value of the stock, and on the scant evidence and argument it is difficult to understand the basis for respondent's position. It is our opinion that there is support for petitioners' position and we conclude that the net fair market value of the shares of California Eastern Lines held by Old States on the date of liquidation was $170,631. Fair Market Value of Pacific Transport Lines Stock, June 30, 1957: Finally, with respect to the shares of stock of Pacific Transport Lines, which were owned by Old States, and which were acquired by New States in the liquidation of Old States on June 30, 1957, respondent contends that the net fair market value of the stock as of June 30, 1957, was $14,001,505. Petitioners contend that the net fair market value is $12,097,998. Petitioners argue that Pacific Transport Lines had tax-deferred earnings in the amount of $3,640,878.25, which were either on deposit in reserve funds, or invested in subsidized vessels, and petitioners contend that this amount of tax-deferred *512 earnings was subject to tax upon withdrawal from the reserve funds for purposes other than investment in subsidized vessels, or upon the sale of subsidized vessels without reinvestment of the proceeds in subsidized vessels or operations. They contend that the potential corporate tax liability of 52 percent of the tax-deferred earnings, which amounted to $3,640,878.25, together with other restrictions imposed on Pacific Transport Lines' use of its assets by the subsidy contract with Marad should be considered in determining the fair market value of the stock of Pacific Transport Lines as of June 30, 1957. They contend that the potential tax liability and other restrictions reduce the fair market value of the stock from $14,001,505 to $12,097,998. Respondent has determined that the fair market value of Pacific Transport Lines' stock as of June 30, 1957, was $14,001,505. He contends that it is improper for petitioners to reduce the value of the stock of Pacific Transport Lines, for estimated contingent tax liabilities on deposits of 185 tax-deferred earnings. He argues that there was no reasonably foreseeable prospect that such tax liabilities would be incurred in the normal operations *513 of the business. In addition, he contends that there is no evidence that such deposits of tax-deferred earnings, subject to contingent tax liabilities, would decrease the value of the stock of Pacific Transport Lines, to any purchaser who would continue its operations under an operating-differential subsidy contract. He also argues that the restrictions on the contractor's use of its assets does not operate to reduce the fair market value of its stock, when consideration is given to the benefits such as tax-deferment of earnings from subsidized operations, which were enjoyed by Pacific Transport Lines. The parties are agreed to the value of the stock of Pacific Transport Lines, with the exception of whether the fair market value of the stock should be discounted for the potential income tax liability on the tax-deferred earnings of $3,640,878.25 and for other restrictions on the use of Pacific Transport Lines assets resulting from the operating-differential contract. In other words, the parties are in agreement that the fair market value of the stock of Pacific Transport Lines on June 30, 1957, is $14,001,505, if no reduction in value is made for the potential tax liability on tax-deferred *514 earnings and for other restrictions on the use of the contractor's assets. The respondent's determination that the fair market value of the shares of stock of Pacific Transport Lines, as of June 30, 1957, was $14,001,505 is sustained. Although there was a potential income tax liability of $1,903,507, which would result if the tax-deferred earnings were withdrawn from the reserve funds for the contractor's own use, petitioners have presented no evidence showing the likelihood or probability that those earnings would be withdrawn and taxed. Upon the facts presented, there is no way of determining when, if ever, these deferred earnings would be subject to taxation. There was no reasonably foreseeable prospect that such tax liabilities would ever be incurred in the normal operations of the business. The normal operations of Pacific Transport Lines, and of New States, which succeeded to the subsidy contract of Pacific Transport Lines shortly after acquiring the stock of the latter on June 30, 1957, contemplated an indefinitely continuing subsidy contract with Marad. There is nothing in the evidence presented to suggest that the subsidy contract would be terminated at some definite *515 future date and the tax-deferred earnings in the reserve funds withdrawn and taxed. Ordinarily, the subsidy contracts with Marad, such as the one under which Pacific Transport Lines operated, were effective for a period of 20 years, and the contracts were renewable at the option of Marad. There is no evidence that Pacific Transport Lines' subsidy contract would be terminated at the end of the contract period or that its subsidy contract would not be renewed by Marad. Indeed, when New States succeeded to the subsidy contract of Pacific Transport Lines, it was granted a 20 year subsidy contract, a contract which was, in fact, merely a renewal of Pacific Transport Lines' contract. Because the taxation of the exempted earnings of the subsidized carrier can be deferred for such an extended and indefinite period, it is our conclusion that the fair market value of the stock of Pacific Transport Lines as of June 30, 1957, should not be discounted for the potential tax liability. Nor do we find that the value of the stock of Pacific Transport Lines should be discounted for restrictions on the use of the contractor's assets resulting from the Marad contract, because it is our finding and *516 conclusion that the advantages conferred by the contract in the way of tax-deferral of subsidized earnings more than offset any disadvantages attributable to the limited restrictions on the use of the contractor's assets. The petitioners have not met their burden of proof with respect to the question of fair market value of Pacific Transport Lines' stock on June 30, 1957. It is without question that the tax-deferred earnings had the same purchasing power as tax-paid capital when applied for subsidized ships or other subsidized purposes, a fact which we consider significant. Moreover, even if we assume (without finding) that the tax-deferred earnings will eventually be taxed, petitioners have not shown when taxation of those deferred earnings will occur, so that there is no way for us to determine or compute the amount by which the value of Pacific Transport Lines' stock should be discounted. Nor have petitioners shown how a discount for the potential tax liability can be determined in amount. Therefore, petitioners' contention with respect to the fair market value of the Pacific Transport Lines stock must be rejected. On the basis of the evidence, it is our finding and conclusion *517 that the net fair market value of the 186 Pacific Transport Lines stock on June 30, 1957, was $14,001,505. Several adjustments of the respondent have been disposed of under stipulations which are to be given effect under Rule 50. Some issues have been conceded by each party. Recomputations of the deficiencies under Rule 50 are required. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Pacific Atlantic Steamship Co., docket No. 2824-65; States Steamship Company (formerly States Line, Inc.) and Subsidiaries, docket No. 2825-65; States Steamship Company, docket No. 2928-65; Portland Stevedoring Company, docket No. 2929-65; Pacific Atlantic Steamship Co., docket No. 2930-65; Pacific Transport Lines, Inc., docket No. 2931-65; California Eastern Lines, Inc., docket No. 2932-65; States Steamship Company (formerly States Line, Inc.), docket No. 2933-65; California Eastern Lines, Inc., docket No. 2934-65; and Portland Stevedoring Company, docket No. 2935-65.↩
*. Excess of deposits to reserve funds over depreciation allowable for tax purposes constituting deposits of tax-deferred earnings.↩
*. The total amount of the deductions was $7,959,162.74, including the deposit with Marad of $2,074,028.43. The exclusion of that deposit from income, as tax-deferred income, necessitates the exclusion of the deposit from deductions leaving total deductions of $5,885,134.31.↩
*. The total sum of the claimed deductions for carrybacks of the 1959 net operating loss, $1,504,766.55, rather than $1,455,802.07, is not explained. The parties will make such adjustments as are required, if any, under Rule 50, but here the seeming discrepancy appears not to be relevant.↩
2. The pertinent parts of section 381, namely, sections 381(a) and 381(c)(16), are as follows: SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS. (a) GENERAL RULE. - In the case of the acquisition of assets of a corporation by another corporation - (1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b) (2); or (2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D) (but only if the requirements of subparagraphs (A) and (B) of section 354(b)(1) are met), or (F) of section 368(a)(1), the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c). * * * (c) ITEMS OF THE DISTRIBUTOR OR TRANSFEROR CORPORATION. - The items referred to in subsection (a) are: (16) CERTAIN OBLIGATIONS OF DISTRIBUTOR OR TRANSFEROR CORPORATION. - If the acquiring corporation - (A) assumes an obligation of the distributor or transferor corporation which, after the date of the distribution or transfer, gives rise to a liability, and (B) such liability, if paid or accrued by the distributor or transferor corporation, would have been deductible in computing its taxable income, the acquiring corporation shall be entitled to deduct such items when paid or accrued, as the case may be, as if such corporation were the distributor or transferor corporation. A corporation which would have been an acquiring corporation under this section if the date of distribution or transfer had occurred on or after the effective date of the provisions of this subchapter applicable to a liquidation or reorganization, as the case may be, shall be entitled, even though the date of distribution or transfer occurred before such effective date, to apply this paragraph with respect to amounts paid or accrued in taxable years beginning after December 31, 1953, on account of such obligations of the distributor or transferor corporation. This paragraph shall not apply if such obligations are reflected in the amount of stock, securities, or property transferred by the acquiring corporation to the transferor corporation for the property of the transferor corporation. ↩
3. SEC. 361. NONRECOGNITION OF GAIN OR LOSS TO CORPORATIONS. (a) GENERAL RULE. - No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.↩
4. SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS. * * * (b) LIQUIDATION OF SUBSIDIARY. - (1) IN GENERAL. - If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), then, except as provided in paragraph (2), the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor. If property is received by a corporation in a transfer to which section 332(c) applies, and if paragraph (2) of this subsection does not apply, then the basis of the property in the hands of the transferee shall be the same as it would be in the hands of the transferor. (2) EXCEPTION. - If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if - (A) the distribution is pursuant to a plan of liquidation adopted - (i) on or after June 22, 1954, and (ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and (B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12-month period beginning with the earlier of, (i) the date of the first acquisition by purchase of such stock, or (ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.↩
5. Sec. 607(h) of the Merchant Marine Act, 1936, as amended, is:
(h) The earnings of any contractor receiving an operating-differential subsidy under authority of this chapter, which are deposited in the contractor's reserve funds as provided in this section, except earnings withdrawn from the special reserve funds and paid into the contractor's general funds or distributed as dividends or bonuses as provided in paragraph 4 of subsection (c) of this section, shall be exempt from all Federal taxes. Earnings withdrawn from such special reserve fund shall be taxable as if earned during the year of withdrawal from such fund. * * * ↩
6. Sec. 123. CROSS REFERENCES TO OTHER ACTS.
(a) For exemption of - * * * (7) Earnings of ship contractors deposited in special reserve funds, see section 607(h) of the Merchant Marine Act, 1936, as amended, (52 Stat. 961, § 28; 46 U.S.C. 1177↩);
7. See footnote 4.↩
8. Sec. 1.334-1 Basis of property received in liquidations. * * * (c) Application of stock basis to property. If section 334(b)(2) applies to a complete liquidation to which section 332 is applicable, then property received by a parent corporation in such complete liquidation shall have a basis determined by reference to the basis of the stock of the subsidiary corporation with respect to which it is received. In general, section 334 (b)(2) will be applicable to a distribution in complete liquidation of a subsidiary corporation if the parent corporation purchased, within the meaning of section 334(b)(3) and during a period of not more than twelve months, 80 percent or more of the stock (other than nonvoting stock which is limited and preferred as to dividends) of the subsidiary corporation and then adopted a plan of liquidation (on or after June 22, 1954) not more than two years after the date on which the stock ownership requirement was met. The application of section 334(b)(2) is subject to the following rules: * * * (4) For the purpose of section 334(b)(2) only, the following adjustments shall be made to the adjusted basis of the subsidiary's stock in the hands of the parent: * * * (v) The adjusted basis of the subsidiary's stock held by the parent with respect to which the distributions in liquidation are made (reduced as in subdivision (i) of this subparagraph) - (a) Shall be increased - (1) By the amount of any unsecured liabilities assumed by the parent, and (2) By the portion of the subsidiary's earnings and profits (less the amount of any distributions therefrom) of the period beginning on the date of purchase and ending upon the date of the last distribution in liquidation attributable to the stock of the subsidiary held by the parent. (b) Shall be decreased: (1) By the amount of any cash and its equivalent received, and (2) By the portion of the subsidiary's deficit in earnings and profits of the period beginning on the date of purchase and ending upon the date of the last distribution in liquidation attributable to the stock of the subsidiary held by the parent. (b) Shall be decreased: (1) By the amount of any cash and its equivalent received, and (2) By the portion of the subsidiary's deficit in earnings and profits of the period beginning on the date of purchase and ending upon the date of the last distribution in liquidation attributable to the stock of the subsidiary held by the parent. (vi) For the purpose of subdivision (v)(a)(2) and (b)(2) of this subparagraph: * * * (c) In order to prevent distortion in the adjusted basis of the stock: (1) Transactions (including distributions, liquidations, and reorganizations) involving a corporation the affairs of which the subsidiary controls at any time after the date of purchase through ownership of stock (whether or not the subsidiary owns a majority of the stock of such corporation) may be disregarded in whole or in part, and (2) Tax-free reorganizations involving the subsidiary may be disregarded in whole or in part, and * * * (viii) In the case of a distribution by the subsidiary of property directly or indirectly acquired by the subsidiary through a direct or indirect contribution to capital by the parent, the basis of such property to the parent shall be the same as if such contribution had not been made and the adjusted basis of the stock shall not be increased or decreased because of such contribution and distribution. Except as provided in the preceding sentence, the amount of the adjusted basis of the stock adjusted as provided in this paragraph shall be allocated as basis among the various assets received (except cash and its equivalent) both tangible and intangible (whether or not depreciable or amortizable). Ordinarily, such allocation shall be made in proportion to the net fair market values of such assets on the date received (the net fair market value of an asset being its fair market value less any specific mortgage or pledge to which it is subject). To that portion of the basis thus determined, for each property against which there is a lien, should be added the amount of such lien. Where more than one property is covered by the same lien, the amount of the lien should be divided among the properties, allocating to each that portion of the lien which the fair market value of such property bears to the total fair market value of the properties covered by the same lien. Whether the mortgage indebtedness is assumed by the parent or the property is taken subject to the mortgage is immaterial. The basis of the property received shall be zero if the cash and its equivalent received is equal to or in excess of the adjusted basis of the stock.↩
*. Respondent has conceded by stipulation that the disallowance of the depreciation claimed by petitioners with respect to the period July 1, 1957, to September 9, 1957,is improper to the extent of $6,803.21. The remaining portion of this depreciation adjustment which amounts to $14,909.84, is still disputed by the parties.↩